## INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS ET AL. *v.* NATIONAL LABOR RELATIONS BOARD.

No. 108.   Argued February 26–27, 1951.—Decided June 4, 1951.

*Louis Sherman* argued the cause for petitioners. With him on the brief was *Philip R. Collins.*

*Mozart G. Ratner* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, David P. Findling* and *Bernard Dunau.*

*Clif Langsdale* filed a brief for the United Brotherhood of Carpenters & Joiners of America, A. F. of L., et al., as *amici curiae,* supporting petitioners.

MR. JUSTICE BURTON delivered the opinion of the Court.

This is a companion case to No. 393, *Labor Board* v. *Denver Building Trades Council* (the *Denver* case), *ante,* p. 675, and No. 85, *Local 74, United Brotherhood of Carpenters* v. *Labor Board* (the *Chattanooga* case), *post,* p. 707.

The principal question here is whether a labor organization and its agent committed an unfair labor practice, within the meaning of § 8 (b) (4) (A) of the National Labor Relations Act, 49 Stat. 449, 29 U. S. C. § 151, as

amended by the Labor Management Relations Act, 1947,[1] when, by peaceful picketing, the agent induced employees of a subcontractor on a construction project to engage in a strike in the course of their employment, where an object of such inducement was to force the general contractor to terminate its contract with another subcontractor. For the reasons hereafter stated, we hold that an unfair labor practice was committed.

In December, 1947, the Giorgi Construction Company, a partnership (here called Giorgi), having its principal place of business at Port Chester, New York, contracted to build a private dwelling in Greenwich, Connecticut. The contract price was $15,200. Giorgi did part of the work with its own employees but subcontracted the electrical work to Samuel Langer and the carpentry work to Nicholas Deltorto, the principal place of business of each of whom was also at Port Chester. Langer's subcontract was for $325.

Langer in the past had employed union men but, prior to this project, had become involved in a dispute with petitioner, International Brotherhood of Electrical Workers, Local 501, A. F. of L., here called the Electricians Union, because of his employment of nonunion men. By the middle of April, 1948, Langer's two electricians, neither of whom was a member of the Electricians Union, had completed the roughing in of the electrical work which was necessary before the walls of the house could be completed. At that point, on two days when no employees of Langer were present on the project, but before the completion of Langer's subcontract, William Patterson, the other petitioner herein, visited the project in his capacity of agent and business repre-

---

[1] 61 Stat. 140–141, 29 U. S. C. (Supp. III) § 158 (b) (4) (A). For text see *Labor Board* v. *Denver Building Trades Council, ante,* p. 677, note 1.

sentative of the Electricians Union. The only workmen then present were Deltorto and his two carpenters, each of whom was a member of Local 543, United Brotherhood of Carpenters & Joiners of America, A. F. of L., here called the Carpenters Union. Patterson informed Deltorto and one or both of his workmen that the electrical work on the job was being done by nonunion men. Deltorto and his men expressed ignorance of that fact, but Patterson, on the second day of his visits, repeated the statement and proceeded to picket the premises himself, carrying a placard which read "This job is unfair to organized labor: I. B. E. W. 501 A. F. L." Deltorto and his men thereupon stopped work and left the project. Deltorto promptly telephoned Giorgi, the general contractor, that his carpenters had walked off the job because the electrical delegate had picketed it. Patterson also telephoned Giorgi saying that Langer was "unfair" and that Giorgi would have to replace Langer with a union contractor in order to complete the job. He added that if Giorgi did not replace Langer, he would not receive any skilled trades to finish the rest of the work.

No communication was had with Langer by either of petitioners. The next day, Giorgi recited these circumstances to Langer and the latter released Giorgi from the electrical subcontract, saying that he would step aside so that a union subcontractor could take over. He did no further work on the project. Giorgi informed Deltorto that the trouble had been straightened out, and the latter's carpenters returned to the project.

On a charge filed by Langer, based upon these events, the Regional Director of the National Labor Relations Board issued a complaint against the Electricians Union and Patterson. It alleged that they had induced and encouraged the employees of Deltorto to engage in a strike or a concerted refusal in the course of their employment to perform services for him, an object thereof

being to force or require Giorgi to cease doing business with Langer in violation of § 8 (b) (4) (A).[2]

With the consent of the present petitioners, a restraining order was issued against them by the United States District Court for the Southern District of New York, pursuant to § 10 (1).[3] The complaint was referred to the same trial examiner who heard the *Denver* case, *ante,* p. 675. He distinguished the action of petitioners from that which he had found in the *Denver* case to constitute a strike signal, and recommended dismissal of the complaint on the ground that petitioners' action here was permissible under § 8 (c), despite the provisions of § 8 (b) (4) (A). The Board, with two members dissenting, upheld its jurisdiction of the complaint against a claim that the actions complained of did not sufficiently affect interstate commerce. The majority of the Board so holding then affirmed the rulings which the examiner had made during the hearings, adopted certain of his findings, conclusions and recommendations, attached his intermediate report to its decision, but declined to follow his recommendation to dismiss the complaint. The Board expressly held that § 8 (c) did not immunize petitioners' conduct from the proscriptions of § 8 (b) (4) (A). 82 N. L. R. B. 1028. It ordered petitioners to—

> "Cease and desist from inducing or encouraging the employees of Nicholas Deltorto or any employer, by picketing or related conduct, to engage in a strike or a concerted refusal in the course of their employment to perform any services, where an ob-

---

[2] The complaint referred originally not only to the unfair labor practice here considered but also to coercion in violation of § 8 (b) (1) (A), and to threats of action addressed to other employers. Those charges were dismissed by the Board and are not before us.

[3] 61 Stat. 149–150, 29 U. S. C. (Supp. III) § 160 (*l*). For text see *Labor Board* v. *Denver Building Trades Council, ante,* p. 682, note 10.

ject thereof is to force or require Giorgi Construction Co. or any other employer or person to cease doing business with Samuel Langer." *Id.,* at 1030.

Petitioners asked the United States Court of Appeals, under § 10 (f),[4] to review and set aside that order. The Board answered and asked enforcement of it. With one judge dissenting, the court below ordered enforcement. 181 F. 2d 34. We granted certiorari. 340 U. S. 902. See *Labor Board* v. *Denver Building Trades Council, ante,* p. 675.

1. Petitioners contest the jurisdiction of the Board on the ground of the insufficiency of the effect of the actions complained of upon interstate commerce. The facts, which were found in detail in the intermediate report, approved by the Board and upheld by the court below, are in our opinion sufficient to sustain that jurisdiction on the grounds stated in the *Denver* case, *ante,* p. 675. In addition, the contractor and both subcontractors in the instant case had their principal places of business in New York. The performance of their contractual obligations on this project in Connecticut accordingly emphasizes the interstate movement of the services and materials which they here supplied.

2. The secondary character of the activities here complained of and their objectives also come within the pattern of the *Denver* case. In the instant case, a labor dispute had been pending for some time between Langer and the Electricians Union, but no demands were made upon him directly by either of petitioners in connection with this project. There are no findings that the picketing was aimed at Langer to force him to employ union workmen on this job. On the contrary, the findings demonstrate that the picketing was directed at Deltorto's employees to induce them to strike and thus force Deltorto,

---

[4] 61 Stat. 148–149, 29 U. S. C. (Supp. III) § 160 (f).

the carpentry subcontractor, to force Giorgi, the general contractor, to terminate Langer's electrical subcontract.

3. The *Denver* case also covers the point that it was sufficient that *an* objective of the picketing, although *not necessarily the only* objective of the picketing, was to force Giorgi to terminate Langer's uncompleted contract and thus cease doing business with him on the project.

4. The principal feature of the instant case, not squarely covered by the *Denver* case, is that there is no finding here that the picketing and other activities of petitioners were mere signals in starting and stopping a strike in accordance with by-laws or other controlling practices of the Electricians and Carpenters Unions. The complaint here is not that petitioners, like the Trades Council in the *Denver* case, themselves *engaged in* or called a strike of Deltorto's carpenters in order to force the general contractor to cease doing business with the electrical subcontractor. Here the complaint is that petitioners, by peaceful picketing, rather than by prearranged signal, induced or encouraged the employees of Deltorto to strike (or to engage in a concerted refusal to perform any services for Deltorto) in the course of their employment to force Giorgi, the contractor, to cease doing business with Langer, the electrical subcontractor.

While in the *Denver* case we have held that § 8 (c) [5] had no application to a strike signal, there are other considerations that enter into the decision here. The question here is what effect, if any, shall be given to § 8 (c) in its application to peaceful picketing conducted by a labor organization or its agents merely as an induce-

---

[5] "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit." 61 Stat. 142, 29 U. S. C. (Supp. III) § 158 (c).

ment or encouragement of employees to engage in a secondary boycott. Petitioners contend that § 8 (c) immunizes peaceful picketing, even though the picketing induces a secondary boycott made unlawful by § 8 (b) (4). The Board reached the opposite conclusion and the court below approved the Board's order as applied to the facts of this case which it recognized as amounting to "bare instigation" of the secondary boycott.[6] We agree with the Board.

a. To exempt peaceful picketing from the condemnation of § 8 (b) (4) (A) as a means of bringing about a secondary boycott is contrary to the language and purpose of that section. The words "induce or encourage" are broad enough to include in them every form of influence

---

[6] This issue is extensively reviewed and determined in favor of the view that § 8 (c) does not immunize otherwise unfair labor practice against § 8 (b) (4) (A) in *United Brotherhood of Carpenters*, 81 N. L. R. B. 802, 807–816. In affirming that conclusion the Court of Appeals for the Tenth Circuit said:

"They established a picket at the building project of Klassen. And they placed Klassen on a so-called blacklist and gave wide circulation of the fact among those particularly interested in the building industry, all for the purpose of compelling Klassen to cease doing business with Wadsworth. There is nothing in the language or legislative history of section 8 (c) which indicates persuasively a Congressional intent to create an asylum of immunity from the proscription of section 8 (b) (4) (A) for acts and conduct of that kind." *Labor Board* v. *United Brotherhood of Carpenters*, 184 F. 2d 60, 62.

Petition for certiorari was filed in this Court and action on the petition was withheld pending decision of the instant cases. The United Brotherhood of Carpenters filed a brief as *amicus curiae* in connection with the hearings of these cases and the petition of certiorari is this day being denied, *post*, p. 947. See also, *United Brotherhood of Carpenters* v. *Sperry*, 170 F. 2d 863, 868–869; *Printing Specialties Union*, 82 N. L. R. B. 271; *Bricklayers Union*, 82 N. L. R. B. 228; *Local 1796, United Brotherhood of Carpenters*, 82 N. L. R. B. 211; Dennis, The Boycott Under the Taft-Hartley Act, N. Y. U. Third Annual Conference on Labor (1950), 367, 382–386.

and persuasion.[7]   There is no legislative history to justify
an interpretation that Congress by those terms has lim-
ited its proscription of secondary boycotting to cases
where the means of inducement or encouragement amount
to a "threat of reprisal or force or promise of benefit."
Such an interpretation would give more significance to
the means used than to the end sought.   If such were
the case there would have been little need for § 8 (b) (4)
defining the proscribed objectives, because the use of
"restraint and coercion" for any purpose was prohibited
in this whole field by § 8 (b) (1) (A).

"Induce or encourage" appear in like context in § 303.
The action proscribed by the terms of § 8 (b) (4) is made
in § 303 the basis for the recovery of damages in a civil
action.   Because § 8 (c) is in terms limited to unfair
labor practice proceedings and § 303 refers only to civil
actions for damages,[8] it seems clear that § 8 (c) does not
apply to an action under § 303.   That section does not
mention unfair labor practices through which alone the

---

[7] Induce: "1. To lead on; to influence; to prevail on; to move by
persuasion or influence."

Encourage: "1. To give courage to; to inspire with courage, spirit,
or hope; to raise the confidence of; to animate; hearten; . . . .

"2. To embolden, incite, or induce as by inspiration, recommendation,
etc.; hence, to advise; . . . .

"3. To give help or patronage to, as an industry; to foster; . . . ."
Webster's New Int'l Dict., Unabridged (2d ed. 1945).

[8] "Sec. 303. (a) It shall be unlawful, for the purposes of this sec-
tion only, in an industry or activity affecting commerce, for any
labor organization to engage in, or to induce or encourage the em-
ployees of any employer to engage in, a strike or a concerted refusal
in the course of their employment to use, manufacture, process, trans-
port, or otherwise handle or work on any goods, articles, materials,
or commodities or to perform any services, where an object thereof
is—

"(1) forcing or requiring any employer or self-employed person to
join any labor or employer organization or any employer or other

provisions of § 8 (c) can become applicable. If § 8 (c) were given the effect which petitioners urge, it would limit § 8 (b) (4) (A) so as to give the words "induce or encourage" a meaning in that section different than they have in § 303. We think that the words are entitled to the same meaning in §§ 8 (b) (4) and 303.

b. The intended breadth of the words "induce or encourage" in § 8 (b) (4) (A) is emphasized by their contrast with the restricted phrases used in other parts of § 8 (b). For example, the unfair labor practice described in § 8 (b) (1) is one "to restrain or coerce" employees; in § 8 (b) (2) it is to "cause or attempt to cause an employer"; in § 8 (b) (5) it is to "require of employees"; and in § 8 (b) (6) it is to "cause or attempt to cause an employer." The scope of "induce" and especially of "encourage" goes beyond each of them.

c. To exempt peaceful picketing from the reach of § 8 (b) (4) would be to open the door to the customary means of enlisting the support of employees to bring economic pressure to bear on their employer. The Board quickly recognized that to do so would be destructive of the purpose of § 8 (b) (4) (A). It said "To find that peaceful picketing was not thereby proscribed would be to impute to Congress an incongruous intent to permit, through indirection, the accomplishment of an objective

---

person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

. . . . .

"(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit." 61 Stat. 158–159, 29 U. S. C. (Supp. III) § 187.

which it forbade to be accomplished directly." *United Brotherhood of Carpenters,* 81 N. L. R. B. 802, 811. Also—

> "It was the *objective* of the unions' secondary activities . . . and not the *quality of the means* employed to accomplish that objective, which was the dominant factor motivating Congress in enacting that provision. . . . In these circumstances, to construe Section 8 (b) (4) (A) as qualified by Section 8 (c) would practically vitiate its underlying purpose and amount to imputing to Congress an unrealistic approach to the problem." (Emphasis in original.) *Id.,* at 812.

The legislative history does not sustain a congressional purpose to outlaw secondary boycotts under § 8 (b) (4) and yet in effect to sanction them under § 8 (c).

d. We find no indication that Congress thought that the kind of picketing and related conduct which was used in this case to induce or encourage a strike for an unlawful object was any less objectionable than engaging directly in that strike. The court below, after finding that there was "bare instigation" here rather than an appeal to reason by "the expressing of any views, argument, or opinion," traced the development of the doctrine that he who provokes or instigates a wrong makes himself a party to it. That court then reached the conclusion that it is "highly unlikely that by § 8 (c) Congress meant to abolish a doctrine, so deeply embedded in our civil and criminal law." 181 F. 2d at 39.

e. The remedial function of § 8 (c) is to protect noncoercive speech by employer and labor organization alike in furtherance of a lawful object. It serves that purpose adequately without extending its protection to speech or picketing in furtherance of unfair labor practices such as are defined in § 8 (b) (4). The general terms of § 8 (c)

appropriately give way to the specific provisions of § 8 (b) (4).

5. The prohibition of inducement or encouragement of secondary pressure by § 8 (b) (4) (A) carries no unconstitutional abridgment of free speech. The inducement or encouragement in the instant case took the form of picketing followed by a telephone call emphasizing its purpose. The constitutionality of § 8 (b) (4) (A) is here questioned only as to its possible relation to the freedom of speech guaranteed by the First Amendment. This provision has been sustained by several Courts of Appeals.[9] The substantive evil condemned by Congress in § 8 (b) (4) is the secondary boycott and we recently have recognized the constitutional right of states to proscribe picketing in furtherance of comparably unlawful objectives.[10] There is no reason why Congress may not do likewise.

6. Petitioners object to the breadth of the Board's order as stated in 82 N. L. R. B. at 1030, *supra*, pp. 698–699. They contend that its language prohibits inducement not only of employees of Deltorto but also the inducement of employees of any other employer to strike, where an object thereof is to force Giorgi or any other employer or person to cease doing business with Langer. To confine the order solely to secondary pressure through Giorgi or Deltorto would leave Langer and other employers who

---

[9] See *Labor Board* v. *United Brotherhood of Carpenters,* 184 F. 2d 60, 62, certiorari denied this day as No. 387, *post,* p. 947; *Labor Board* v. *Local 74, United Brotherhood of Carpenters,* 181 F. 2d 126, 132, aff'd as No. 85, *post,* p. 707; *Labor Board* v. *Wine, Liquor & Distillery Workers Union,* 178 F. 2d 584, 587–588; *Printing Specialties Union* v. *Le Baron,* 171 F. 2d 331, 334–335; *United Brotherhood of Carpenters* v. *Sperry,* 170 F. 2d 863, 868–869. See also, as to § 8 (b) (4) (C), *Douds* v. *Local 1250,* 170 F. 2d 700, 701.

[10] See *Building Service Union* v. *Gazzam,* 339 U. S. 532; *International Brotherhood of Teamsters* v. *Hanke,* 339 U. S. 470; *Hughes* v. *Superior Court,* 339 U. S. 460; *Giboney* v. *Empire Storage Co.,* 336 U. S. 490.

do business with him exposed to the same type of pressure through other comparable channels. The order properly enjoins petitioners from exerting this pressure upon Langer, through other employers, as well as through Giorgi and Deltorto. We may well apply here the principle stated in *International Salt Co.* v. *United States,* 332 U. S. 392, 400: "When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." And see *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 90.

The judgment of the Court of Appeals accordingly is

*Affirmed.*

MR. JUSTICE REED, MR. JUSTICE DOUGLAS and MR. JUSTICE JACKSON would reverse the judgment of the Court of Appeals.