NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

OKLAHOMA CITY GENERAL DRIVERS, WAREHOUSEMEN AND HELPERS, LOCAL UNION 886, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, Respondent.

No. 5262.

United States Court of Appeals
Tenth Circuit.

July 5, 1956.

Alice Andrews, Washington, D. C. (Theophil C. Kammholz, David P. Findling, Marcel Mallet-Prevost, Frederick U. Reel, Washington, D. C., were with her on the brief), for petitioner.

Frank Grayson, Oklahoma City, Okl., for respondent.

Before BRATTON, Chief Judge, PHILLIPS, Circuit Judge, and ROGERS, District Judge.

ROGERS, District Judge.

This proceeding was brought to this Court by a Petition to the Court for the enforcement of an Order heretofore entered by the petitioner, National Labor Relations Board, against the Oklahoma City Drivers, Warehousemen and Helpers, Local Union 886, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, pursuant to 61 Stat. 136, 29 U.S. C.A. § 151 et seq. The Order sought to be enforced herein against respondent Union, required the Union to cease and desist from causing or attempting to cause the employer Chief Freight Lines to discriminate against employees in violation of Section 8(a) (3) of the Act.

The Chief Freight Lines Company, hereinafter called "company", whose status in this cause is that of an employer, is engaged in interstate motor vehicle transportation. Respondent Union is a labor organization engaged in promoting and protecting the interests of its members in the State of Oklahoma. The company and the Union entered into a written collective bargaining agreement on November 1, 1952, and the two operated thereunder at all times material hereto. The period of the agreement was for three years. While containing covenants common to most contracts of this nature, the bargaining agreement included the following clauses which require our attention:

(1) A Union Shop provision requiring employees, if accepted, to join and remain members of the Union in good standing as a condition of employment.

(2) A referral provision whereby the company agreed that each newly hired employee would be sent to the Union Office before starting work, for a referral card, which would be issued by the Union without obligation on the part of the applicant.

(3) A seniority clause controlling in lay-offs and in assignment of work, providing, in part, "any controversy over the seniority of an employee shall be referred to the Union for settlement", and

(4) A provision that any employee seeking a leave of absence must "secure written permission from both the Union and the Employer", or suffer "complete loss of seniority".

The employee involved in this litigation is one Winfred Cooksey, who was hired in the summer of 1951, a year preceding the formation of the collective bargaining agreement, by the Company, as a pickup driver and dockman at the company's Oklahoma City terminal. According to his superior, Cooksey was at all times hereto, a satisfactory and thorough, though a somewhat slow worker. No cause for discharge from a work basis standpoint appears. He had been a member of respondent Union since 1941. Cooksey was expelled from the Union effective August 1, 1953 for causes other than failure to pay Union dues or fees. The most that can be gleaned from the record is that expulsion was based on "dishonorable grounds". Cooksey, prior to August 1, 1953, informed Bell, the company's terminal manager, of his expulsion, and his receipt of a dishonorable withdrawal card from the Union. He asked Bell for a ninety-day leave of absence from his job, so as to "iron out his Union difficulties", as Cooksey put it. Bell stated he would not grant such leave without prior approval of the company's president, who lived in Kansas City, Missouri. Written permission for the leave of absence was not received by Cooksey from either the company or the Union. Cooksey ceased work for the company on August 1st. A day or so thereafter, he received from the Union advice that previously tendered dues were refunded on the theory that Cooksey, being no longer a member of the Union, owed it no dues. Cooksey appealed his expulsion matter to the Union's International headquarters, but heard nothing from that source. Late in October of 1953, Cooksey went to the company terminal and stated he would like to return to work. The company manager, Bell, stated that

he was fearful of Union reaction if he placed Cooksey back to work, but he thereafter approached the Union business agent, Ralph Mitchell, and asked whether or not the company would be allowed to put Cooksey back to work. In response to such enquiries put to him by the company's Bell, business agent Mitchell claimed that he no longer represented Cooksey, that he only represented men who carried cards, that he was not at liberty to say what might happen if Cooksey were rehired, and that he did not know whether the men working at the company's terminal would desire to go on working with a non-Union member, adding that the company would be in violation of the contract if the company rehired Cooksey, since the latter "walked off the job". Cooksey was informed by the company he would be rehired on presentation by him, of a Union referral card.

While there is some conflict in the testimony, there is substantial evidence in the record that the statements of Mitchell, summarized above, were a very contributing factor in the company's refusal to rehire Cooksey.

Subsequent to the filing of the charges by Cooksey with the petitioner, Bell and Mitchell had another conference. Mitchell's statements were substantially the same as those of the first meeting, with an additional statement to the effect that Mitchell doubted if the Union would issue a referral card. Thereafter the company offered to rehire Cooksey, the latter demanding his previous seniority rights. As the company stated that that was a matter to be determined by the Union, Cooksey refused the tendered re-employment.

■ The single issue to be by us determined is, did the Union, after expelling Cooksey and refusing his tendered dues, cause the company to unlawfully deny him employment? We think that it did.

We may safely assume as our starting premise, that the company had a deep seated disinclination to precipitate a cleavage between it and respondent Union. Labor conflicts in our modern day society, are productive of economic loss to employer and employee alike. Loss to the employer in the instant case is all the more evident when it is considered that the industrial field of motor truck transportation is highly competitive, with vigorous competition not only from rival truckers, but from railroads, as well. Being thus sensitive to potential strikes, it is only natural that great heed would be given any statements uttered by the Union's business agent into whose hands are usually placed relations between the Union and the company in matters such as the instant controversy.

■ In just such a situation as is posed in the above factual narrative, is required the application of the well recognized rule in labor relations law, that "a man is held to intend the foreseeable consequences of his conduct." See Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 338, 98 L.Ed. 455.

■ This Circuit has, in at least three cases, adopted the principle in construing the Act, that appraisal of the effect of statements in the light of the surrounding circumstances, as well as the inferences reasonably to be drawn as to the impression either the representative of the employer or of the Union intended to convey, remain for the Board to determine. See Lane v. N. L. R. B., 10 Cir., 186 F.2d 671; N. L. R. B. v. Beatrice Foods Co., 10 Cir., 183 F.2d 726 and N. L. R. B. v. Local Union 55, 10 Cir., 218 F.2d 226.

■ That no direct threats or promises to the company by the Union are necessary to establish violations of Section 8(a) (3) of the Act, is seen from the case of International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 2 Cir., 181 F.2d 34, affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 and N. L. R. B. v. Radio Officers' Union, 2 Cir., 196 F.2d 960, affirmed 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455, supra.

■ This opinion could be extended considerably in length, were all decisions

of our Federal Courts cited and discussed herein. Suffice it to say that the courts generally, in recent years, have held employers strictly to account on the one hand, and Unions on the other, for veiled, oblique statements in situations akin to that before us now, the forseeable intendment of which would lead to a violation by both parties of the Act.

Applying these rules to the case at bar, we are of the considered opinion that the statements of the Union's business agent were such as would cause the company to fear a strike of its employees, if Cooksey were rehired; that the business agent intended the company to so regard these statements; that the appraisal of such statements was a function of the Board, and that there is substantial basis in the record for the Board's ultimate conclusion herein reflected by the order hereinabove described.

Accordingly, the petition for enforcement is . . .

Granted.