NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNITED HATTERS, CAP AND MILLI-
NERY WORKERS UNION, AFL–
CIO, Respondent.

No. 8173.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 10, 1960.

Decided Jan. 4, 1961.
On Petition for Modification of Order
and Decree March 8, 1961.

Herman I. Branse, Atty., N. L. R. B.,
Washington, D. C. (Stuart Rothman,
Gen. Counsel, Dominick L. Manoli, As-
sociate Gen. Counsel, Marcel Mallet-Pre-
vost, Asst. Gen. Counsel, and Melvin J.
Welles, Atty., N. L. R. B., Washington,
D. C., on the brief), for petitioner.

Jacob J. Edelman, Baltimore, Md.
(Bernard W. Rubenstein, Baltimore, Md.,
on the brief), for respondent.

Before SOBELOFF, Chief Judge,
HAYNSWORTH, Circuit Judge, and
BRYAN, District Judge.

ALBERT V. BRYAN, District Judge.

Picketing of a neutral employer by the United Hatters, Cap and Millinery Workers Union was declared to be an unfair and outlawed labor practice in the order the National Labor Relations Board now seeks to enforce. In response, United defends the picketing as a permissible appeal to the neutral's customers not to buy products of Korber Hats, Inc., a struck manufacturer—not, as the Board has found, the illegal encouragement of the employees of the neutral or of the motor carriers serving the neutral to act to the neutral's hurt. Labor Management Relations Act 1947, as amended.[1] We uphold the order.

The neutral was Theodore Epstein & Sons, a Baltimore, Maryland wholesaler engaged in the purchase and sale of hats and caps. Korber Hats, Inc. of Fall River, Massachusetts, was one of the hat makers from which Epstein bought. All during the time of the present controversy, Korber was in a labor dispute with the respondent United. In September 1958 respondent's business manager informed Epstein by telephone of his dispute with Korber, telling Epstein that there would soon be trouble at the Korber plant. He advised Epstein that the purpose of the call was to warn Epstein to enter elsewhere the orders it usually placed each year with Korber, because shortly no hats would be coming from the Korber plant.

In reply Epstein told United that it had already procured and sold its hats for that year and would buy no more until the next spring. In October 1958 United commenced its strike of Korber. While the attendant picketing was in progress at the Korber plant, about December 3, 1958, United's manager again telephoned Epstein, saying that Korber was making a large shipment of hats to Epstein, and asked whether Epstein would accept or refuse the consignment. The manager cautioned Epstein that the union would in the event of acceptance place a picket line in front of the building occupied by Epstein. On December 4, 1958 the hats from Korber were accepted at the Epstein Company premises.

The following day United established a picket line at the main entrance of the building tenanted by Epstein. The pickets carried placards containing this legend: "T. Epstein and Sons sells nonunion hats made by Korber Hat Company. Do not buy Korber Hats." In the lower portion of the sign was the union's name. Initially the picketing was continuous during the work hours of every working day, but became less regular towards the end of December, 1958, and ceased altogether on January 22, 1959. The only untoward incident was a physical encounter between Epstein's employee and a picket, when the latter blocked the employee's way as he carried some cartons into the building and was pushed aside by the employee.

That the buying by the public of Korber hats was not the primary target of the picket line at Epstein's is at once apparent. To begin with, the prefatory telephone calls show that it was directed at Epstein, not to the public. Epstein on the signs was the accused. Further, of the approximately 900 retail outlets of Epstein, only 25 of them were within the State of Maryland, and of these but 13 were in Baltimore.

Epstein does not make any hats, but orders them from various manufacturers

---

1. Sec. 8(b) (4) (A), not including the amendment of September 14, 1959, 29 U.S.C.A. § 158(b) (4) (A) : "It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport,

or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring \* \* \* any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; \* \* \* "

in an unfinished form, without linings or bands. When finished and assembled by Epstein, the hats bear no markings revealing the manufacturer, such as Korber or any other producer. The shipping boxes and cartons bear the label of Epstein, and Epstein only. Purchases from Epstein, even in the City of Baltimore, are scarcely ever picked up by the buyer at Epstein's business location. In sum, the picketing at its front door would not be seen by the buyers.

The picketing at that point, however, would confront the employees of many employers, other than Korber. Epstein had only a single employee—the one in the encounter with the picket. But, obviously, the appeal was to the employees whose employers dealt with Epstein. These employees were engaged in intra- and interstate transportation. As is well known, this craft is appropriately unionized and is, quite properly, sensitive to a picket line. That was the strategy of picketing Epstein's.

Physically, moreover, Epstein's front door was a ready and advantageous place at which to focus the adversity of United towards Epstein. Epstein occupied the third, fourth and fifth floors of the building. Its rooms were reached by a single entry-way leading into a recessed vestibule from which a passenger and freight elevator provided convenient access. Incoming merchandise from manufactories, as well as outgoing orders, went to and from Epstein by trucks. Their cargo was discharged or loaded at the curb, being manhandled to and from the elevator. To be effective, the pickets needed to patrol only that small frontage. Receipts and deliveries of goods were made throughout each day, their frequency depending upon the season.

At the outset, United questions both the soundness and applicability of the Board's first premise: that the posting of a picket line at the neutral Epstein's premises alone established the inducement or encouragement forbidden by the statute. N. L. R. B. v. Dallas General Drivers, Etc., Local Union 745, 5 Cir., 1959, 264 F.2d 642, 648, certiorari denied

361 U.S. 814, 80 S.Ct. 54, 4 L.Ed.2d 61. We think the proposition sound in the setting here, for the picket line was utilized in its normal function of deterring employees from trampling it. Be that as it may, the fact of the picket line was so complemented by other facts as to give conclusive proof of its inducing and encouraging effect. The accompanying events are those already mentioned: the threatening calls of United's manager to Epstein, the primary direction of the force of the picketing against Epstein, the improbability of its impact upon the public as buyers, and the availability and sensibility of the employees of other employers to the picketing.

That concert in the reaction of these employees would be a natural and reasonable result of the inducement and encouragement offered, is inescapable in view of the broad scope of their employers' operations and the nature of the employees' occupation. Refusal to handle Epstein's "goods, articles, materials or commodities" is exactly what would be expected of the employees if they followed the proffered persuasion. That they did not accept is not proof of the absence of the invitation. National Labor Relations Board v. Associated Musicians, 2 Cir., 1955, 226 F.2d 900, 904, certiorari denied 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483. While that fact may sometimes be enough to confute the assertions of inducement or encouragement, surely it does not here have that strength. Clearly, too, an object, if not the sole object, of the entreaties was to have these employees, in turn, force their employers "to cease using, selling, handling, transporting, or otherwise dealing in the products of" Epstein. National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 1951, 341 U.S. 675, 689, 71 S.Ct. 943, 950, 95 L.Ed. 1284.

The record in its entirety convinces us that the Board's determination rests upon substantial evidence. 29 U.S.C.A. § 160(e); Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456. On their own peculiar facts other cases,

such as Douds v. Local 50 Etc., 224 F.2d 49 (2 Cir., 1955) and United Wholesale & Warehouse Emp., etc. v. N. L. R. B., 1960, 108 U.S.App.D.C. 341, 282 F.2d 824 cited by United, have come to a contrary conclusion. But we find nothing in them to overturn the answer we give upon the proof before us.

■ Nor can we adopt the suggested dismissal of the petition as now presenting only an academic question, inasmuch as the pickets have long since been withdrawn. The Board is entitled to judicial assurance that the respondent cannot with impunity resume its secondary sanctions upon Epstein.

■ Finally, the terms of the Board's order are not objectionably broad, for its injunction not only of Epstein's employees but also "of any employer other than Korber Hats, Inc.". No exception was taken to the terminology of the order when the Trial Examiner's recommended order was filed. Cf. Sec. 10(e) of the Act, 29 U.S.C.A. § 160 (e). Nor was the point intimated here until oral argument. Moreover, the order in its present form is necessary so as to encompass the employees of all the trucking companies carrying goods to and from Epstein. It would hardly be practicable for the Board to specify them by name. True, where deemed advisable we may narrow an order of the Board in an enforcement proceeding, but here we enforce the order as written. International Brotherhood of E. W. v. N. L. R. B., 1951, 341 U.S. 694, 705–706, 71 S.Ct. 954, 95 L.Ed. 1299.

Order enforced.

## On Petition for Modification of Order and Decree

Since the release of our opinion in this case, the respondent union has filed a petition for modification of our decree upholding the order of the National Labor Relations Board. We directed enforcement of the Board's order as written, and we denied the union's request to re-word the order. The point of the petition is that the order commanded the union to cease and desist from activities seeking "to enforce or require" not only Theo. Epstein and Sons but also "any other employer to cease using * * * or doing business with", not only Korber Hats, Inc. but also "any other producer, processor or manufacturer."

Obviously, in these respects the order literally does go beyond the complaint and its related grievances. Equally obviously the terminology in the order never intended or in truth expressed the expansiveness the respondent now apprehends in it. Whenever and wherever the order should hereafter be invoked, it would of course be read in its context, confining the phraseology to the union activities pertinent to the controversy in suit.

The Board cannot enumerate every item of behavior barred by its order; nor can this court. To make the attempt would so particularize the order as to invite repeated hearings by the Board and thus multiply the burdens of enforcement. We think the order is quite intelligible and altogether apt. However, to allay all imaginable concern of its breadth, we will add to the order words explicitly demonstrating that it does not exceed the controversy in suit.

As rewritten, the order of the Board as adopted by our decree will be amended in paragraph numbered 1 thereof to read as follows, the additions now being underscored:

"1. Cease and desist from engaging in, or inducing or encouraging employees of Theo. Epstein and Sons, or of any employer other than Korber Hats, Inc., by picketing or by any other conduct, to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services, where an object thereof is to force or require Theo. Epstein and Sons or any other employer supplying Theo. Epstein and Sons with any material, labor or services in the latter's purchase, processing or sale of the prod-

**954**

ucts of Korber Hats, Inc., to cease using, selling, handling, transporting, or otherwise dealing in the products of, or to otherwise cease doing business with, Korber Hats, Inc., or any other producer, processor, or manufacturer supplying Theo. Epstein and Sons with material, labor or service in the latter's purchase, processing or sale of the products of Korber Hats, Inc."

Order and decree amended.