W. E. WELLS and Sybil R. Wells, etc., et al., Plaintiffs,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO, LOCAL 181, etc., et al., Defendants.

Civ. No. 900.

United States District Court
W. D. Kentucky,
Owensboro Division.

May 18, 1962.

Wells T. Lovett, Owensboro, Ky., for plaintiffs.

Wilbur F. Dassel, Evansville, Ind., Charles R. Isenberg, Louisville, Ky., for defendants.

BROOKS, Chief Judge.

This action was tried before the Court. At the close of the plaintiffs' case, the defendants' motion for a directed verdict was overruled and when the defendants offered no evidence, their renewed motion for a directed verdict was likewise overruled, and the case is submitted on the briefs of the parties.

The plaintiffs: W. E. Wells and Sybil R. Wells, partners d/b/a "Tye and Wells, Contractors," are referred to as "Tye and Wells"; and the twelve employees of the firm who are suing individually are referred to collectively as "employees of Tye and Wells." The defendants are four labor organizations, referred to as Engineers' Local 181, Carpenters' Local 1341, Laborers' Local 1392, and Teamsters' Local 215, and their respective business agents in their representative capacity.

Plaintiffs claim that the defendants engaged in secondary boycott activities of the particular kind proscribed by Sec. 303(a) of the Labor Management Relations Act 1947, as amended, 29 U.S.C.A. § 187, and that, by reason of these activities, the plaintiffs were injured in their business or property and are entitled to relief in the form of damages under Sec. 303(b). At the time of the acts complained of, Sec. 303 provided:

"(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to * * * transport, or otherwise handle or work on any * * * materials * * * where an object thereof is—

"(1) forcing or requiring * * * any employer * * * to cease doing business with any other person;

"(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the rep-

resentative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;

\*    \*    \*    \*    \*    \*

"(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, \* \* \* and shall recover the damages by him sustained and the cost of the suit."

In 1958 Tye and Wells was engaged in highway construction work in various parts of Kentucky, including a project for the improvement of a portion of Kentucky Highway No. 54 in Daviess County known as the Owensboro-Whitesville Road. By contract with the Kentucky Department of Highways, Tye and Wells and the Perrin Construction Company of Cynthiana, Kentucky, as joint venturers, undertook to grade, drain and surface the road at a price in excess of $275,000. The contract provided for liquidated damages of $50 per day for each day over 450 calendar days required to complete the project. Some of the work was sublet, but the grading work was the particular responsibility of the Perrin firm. Tye and Wells was to accomplish the concrete work, including the building of bridges and box culverts, and to this end, an oral agreement was entered into with Transit-Mix Concrete Company whereby Transit-Mix would supply the necessary concrete at an agreed price.

On May 2, 1958, Tye and Wells signed a bargaining contract with the United Construction Workers, District 50, a division of the United Mine Workers of America, and work was commenced on the project on or about May 23. On May 28, pickets appeared at the construction site carrying signs which read "Carpenters, Engineers, Teamsters and Laborers Seek Recognition on this Project."

Preparatory work, including excavating for the box culverts and putting the reinforcing steel in place, had already been accomplished in expectation of timely deliveries of concrete, but with recognition of the picket line by Transit-Mix the concrete was not forthcoming, and work was temporarily halted. In the meantime, the excavations became filled with rain, and much of the work ultimately had to be re-done.

This situation continued through June 9, on which date Wells and Perrin met with the business agents of the four defendants. They insisted that Wells and Perrin agree to replace the United Construction Workers in their employ with members of the defendant unions or sign a contract recognizing these unions as the bargaining agents of their employees. Perrin signed such a contract, but Wells requested and was given a week to "think it over," the defendants' representatives agreeing in the meantime to "phone the pickets in—in Trigg County and also out here at the concrete plant \* \* \*." Picketing ceased the following day, and work was resumed. On June 19 another meeting was held between Wells and the business agents of three of the defendants, Wilkinson of Teamsters' Local 215 being absent. Wells refused to sign a contract with the defendants, and the following day pickets reappeared at the construction site and continued there until enjoined by this Court on July 14, 1958. During this period work was again virtually halted because the necessary concrete was not delivered.

In addition to this picketing and at the same time, there was also activity involving Transit-Mix Concrete Company and its employees. The connection between these activities is obvious, because the Transit-Mix employees were members of Teamsters' Local 215, which, by contract, Transit-Mix had recognized as the bargaining agent of its employees. Article XI of the contract provided that it would not be a violation of the agreement for any employee to refuse to cross any authorized picket line and that the employer would not request or instruct

any employee to do so. The business agent of Teamsters' Local 215 notified Mr. Bristow, one of the owners of Transit-Mix, of the commencement of picketing on both occasions. The evidence is also clear that, notwithstanding attempted subtlety by the Teamsters' business agent, the Transit-Mix employee who served as union steward was advised by the business agent to stay away from the picket line. As the union might have expected and as it undoubtedly intended, this advice was in fact relayed to some, if not all, of the other Transit-Mix employees. The union steward, in turn, informed Bristow of Wilkinson's instructions to him to stay away from the picket line. Bristow did testify that he ordered no deliveries of concrete to the construction site after he was notified of the picketing, but the reasonable inference to be drawn from his testimony is that his actions were not voluntary.

There was no evidence that the defendants other than Teamsters' Local 215 and its business agent ever contacted the Transit-Mix employees or engaged in any activity except the picketing. The evidence did show that, in dealing with Wells, the business agents described their principals as the "Big Four" of the construction industry and that the defendant unions, acting in concert, participated in or controlled the picketing. In view of the direct relationship between the picketing and the other activities involving the Transit-Mix employees, however, the other defendants could not disclaim equal responsibility for the conduct of Teamsters' Local 215, nor have they attempted to do so.

■ It is concluded on the basis of these facts that the plaintiffs have proved their claim. The defendants' contention that this was primary picketing aimed only at securing written contracts covering the hours, wages and working conditions of the employees of Tye and Wells and Perrin Construction Company is not convincing in light of the fact that the defendant unions never claimed they represented the employees of Tye and Wells or that any employee of Tye and Wells

desired to be represented by them. The confinement of picketing to the primary employer's place of business is not decisive of whether the picketing is primary or secondary. International Brotherhood of Electrical Workers, Local 501 v. N. L. R. B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; N. L. R. B. v. Denver Building & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; United Brick & Clay Workers of America v. Deena Artware, Inc., 198 F.2d 637 (C. A.6).

■■ When the defendants went further and engaged in the contemporaneous encouragement of Transit-Mix employees, their conduct became unlawful. The evidence showed that one object of the picketing was to create a line over which Transit-Mix employees would not pass, thus forcing Transit-Mix to cease doing business with Tye and Wells and, in turn, forcing Tye and Wells to recognize the defendants as the representatives of its employees when the defendants had not been certified as such representatives. It is not necessary to find that this was the sole object in order for it to constitute unlawful activity. N. L. R. B. v. Denver Building & Const. Trades Council, supra; N. L. R. B. v. Wine, Liquor & Distillery Workers' Union, 178 F.2d 584, 16 A.L.R.2d 762 (C.A.2).

■ Although the exact extent of the encouragement of Transit-Mix employees cannot be known, the contacts with the union steward, under the circumstances, were sufficient proof that concerted action on the part of neutral employees was being encouraged, and it has been so held in a case where the only employee contacted directly was the union steward. N. L. R. B. v. Local 11, United Brotherhood of Carpenters & Joiners of America, AFL et al., 242 F.2d 932 (C.A.6).

■ There remains only the question of the effect of Transit-Mix's conduct. It is certainly no defense that Transit-Mix might have abided by its contract without union encouragement of its employees. The defendants were free to induce or

encourage Transit-Mix not to deal with Tye and Wells, but they were not free to coerce Transit-Mix by forcing the latter to choose between this course of action and a possible labor dispute with its own employees. In passing on whether conduct similar to that engaged in here constituted an unfair labor practice under Sec. 8(b) (4) (A) of the same Act, 29 U.S.C.A. § 158(b) (4) (A), the wording of which is identical with the section involved here, the Supreme Court concluded that it did, notwithstanding employer acquiescence in the refusal of its employees to handle non-union goods. Local 1976, United Brotherhood of Carpenters and Joiners of America, AFL et al. v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186. There, too, the facts were that the employer had not ordered its employees to handle the non-union goods. It was contended that the employer had voluntarily recognized its contractual obligation under a "hot cargo clause", but the Supreme Court disposed of this with the following language:

"The potentiality of coercion in a situation where the union is free to approach the employees and induce them to enforce their contractual rights by self-help is very great. Faced with a concerted work stoppage already in progress, an employer may find it substantially more difficult than he otherwise would to decide that business should go on as usual and that his employees must handle the goods. His 'acquiescence' in the boycott may be anything but free. In order to give effect to the statutory policy, it is not unreasonable to insist, as the Board has done, that even when there is a contractual provision the union must not appeal to the employees or induce them not to handle the goods."

Where, as here, the employer knew of the picketing and the encouragement of his employees to observe the picket line, his actions could not have been voluntary, regardless of the course he chose to take.

The non-delivery of concrete idled much of Tye and Wells' valuable heavy equipment, and Wells' testimony as to the reasonable rental value of the equipment was offered to prove the extent of this loss. It was suggested that Wells' figure was in excess of rental estimates obtained by the defendants, but no proof of this was offered. It did appear upon cross-examination of Wells that he had calculated his loss on the basis of the total number of days between the commencement and termination of picketing on both occasions, a total of 35 days. Since, as Wells testified, it was customary to work only five or six days a week, no recovery can be had for the idling of equipment on weekends and holidays.

Tye and Wells eventually had liquidated damages of $50 a day for over 35 days deducted from the contract price by the Department of Highways. Again, a lesser number of work days was lost by reason of the boycott, and to that extent only can it be presumed that Tye and Wells incurred liquidated damages on account of the defendants' activities.

The amount paid by Tye and Wells for salaries of its supervisory personnel when there was no work being done and no workers to be supervised is also a proper element of damages.

Beyond this, there were allegations and proof that Tye and Wells might have been injured in other ways, but there was no proof upon which an award of damages can be made. Upon consideration of all the evidence it is concluded that Wells incurred damages in the sum of $5,500.00.

The stipulated and uncontradicted testimony of the employees of Tye and Wells is accepted as the proper measure of their damages.

Counsel for plaintiffs will tender judgment in accordance with this opinion on notice.