**ALLIED CONCRETE, INC., an Arizona Corp., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Building Materials and Miscellaneous Drivers, Teamsters Local No. 83, Intervenors.**

No. 77–3520.

United States Court of Appeals, Ninth Circuit.

Sept. 26, 1979.

Rehearing Denied Nov. 16, 1979.

James S. Bryan, O'Melveny & Myers, Richard R. White, Los Angeles, Cal., G. Gregory Eagleburger, Corbet & Eagleburger, Phoenix, Ariz. (argued), for petitioner.

Elliott Moore, NLRB–Washington, D.C., Michael J. Keenan, Phoenix, Ariz., Michael J. Keenan, Phoenix, Ariz. (argued), for respondent.

* The Honorable Luther L. Bohanon, Senior United States District Judge for the Northern, East-

Before TRASK and HUG, Circuit Judges, and BOHANON *, Senior District Judge.

HUG, Circuit Judge:

This case is before us on the petition of Allied Concrete, Inc. to review and set aside an order of the National Labor Relations Board, dismissing an unfair labor practice complaint against the Union, Building Materials and Miscellaneous Drivers, Teamsters Local No. 83. The Board has filed a cross-application for enforcement of the order and the Union has been granted leave to intervene. The Board found that the Union did not commit certain unfair labor practices when it failed to restrict its picketing near Allied's reserve gate at a common situs construction project. We find that the Board's determination is not supported by substantial evidence and therefore reverse.

## FACTS

Allied, an Arizona corporation engaged in the processing, mixing and delivering of ready-mix concrete, employs from twenty to fifty delivery truck drivers, all represented for purposes of collective bargaining by the Union. In 1976, Allied was a subcontractor of Ashton Company, Inc., the general contractor for the construction of highway overpasses on Interstate 10, outside of Phoenix, Arizona. Allied had contracted with Ashton to supply concrete for the overpass. The collective bargaining agreement between Allied and the Union expired on May 31, 1976. Thereafter, the parties could not conclude a new agreement, and the Union went on strike against Allied on June 25, 1976.

On July 19, 1976, the day before Allied was scheduled to make a delivery of concrete to the Ashton job site, Allied Presi-

ern and Western Districts of Oklahoma, sitting by designation.

dent John Newell posted signs at the three entrances to the construction site after obtaining permission to do so from Ashton. One sign reserved one entrance for the exclusive use of Allied and its employees and suppliers, and was placed about 300 yards east of the pour site.[1] That gate could be seen from the pour site. The other two signs reserved two entrances for all other contractors.[2] That same day Allied also delivered to the Union a letter notifying them of the establishment of the reserve entrances and requesting them to confine any picketing to the Allied entrance.

On July 20, 1976, at 5:30 A.M., Allied attempted to deliver concrete to the project. Three vehicles containing picketers accompanied the Allied truck to the job site; and, upon reaching the site, the truck went through the Allied entrance and proceeded to the pour site, followed by the three vehicles. At the pour site the picketers, five in number, got out of their vehicles and proceeded to picket around the Allied truck with signs reading: "Picket—Teamsters Local 83 on Strike Against Allied Concrete." In response, all of the Ashton employees walked off the job and the Allied truck driver returned to the plant, without unloading. Later that afternoon, Union shop steward Walker drove up to Ashton finishing foreman Parker and stated that he appreciated the Ashton employees' walking off the job. Parker replied that it was the duty of Ashton employees to walk off, because the Allied employees' strike was an authorized Teamsters' strike and the Ashton employees were not allowed to work behind picket lines. Seven days later, on July 27, 1976, Allied attempted another delivery, with virtually the same result. Ashton then cancelled its contract with Allied.

On August 13, 1976, based on Allied's allegation that the Union had engaged in a secondary boycott at the construction site, the Board issued a complaint against the Union. In a hearing, an administrative law judge ruled that the Union, by its picketing, had violated §§ 8(b)(4)(i) and 8(b)(4)(ii)(B) of the National Labor Relations Act as amended, 29 U.S.C. § 158(b)(4)(i) and § 158(b)(4)(ii)(B) (1976).[3] The Board, in a 3–2 decision, reversed the ALJ's ruling. It found that the Union did not engage in a secondary boycott by the manner in which it conducted its picketing. It therefore ordered that the unfair labor practice complaint be dismissed.

## DISCUSSION

■ Section 8(b) was intended to meet "the dual congressional objectives of preserving the right of labor organizations to

1. The sign read:
   THIS ENTRANCE RESERVED FOR THE EXCLUSIVE USE OF ALLIED CONCRETE COMPANY, ITS EMPLOYEES AND SUPPLIERS. ALL OTHER CONTRACTORS, THEIR EMPLOYEES AND SUPPLIERS, MUST USE THE ENTRANCES LOCATED AT EITHER OGLESBY ROAD AND I–10 OR MILLER ROAD SOUTH OF THE I–10 OVERPASS.

2. These signs read:
   THIS ENTRANCE RESERVED FOR EMPLOYEES AND SUPPLIERS OF ALL CONTRACTORS EXCEPT ALLIED CONCRETE, INC.
   ALLIED CONCRETE, ITS EMPLOYEES AND SUPPLIERS MUST USE ENTRANCE LOCATED AT WEST BOUND OFF–RAMP APPROX. 300 YARDS EAST OF MILLER ROAD OVERPASS.

3. 29 U.S.C. § 158(b) in part provides:
   It shall be an unfair labor practice for a labor organization or its agents—

   .     .     .     .     .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

   .     .     .     .

   (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person    .    .    .:  *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;   .    .   .. (emphasis in original)

bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own". *NLRB v. Denver Bldg. Council*, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). This court, in *NLRB v. Northern Cal. Dist. Coun. of Hod Carriers, Etc.*, 389 F.2d 721 (9th Cir. 1968), further explained the meaning of § 8(b) as follows:

This section proscribes *secondary* activity, but by its express proviso allows for primary activity even though such activity may indirectly affect a secondary employer. Thus, the crucial question in this type of case is always to determine the object of the labor activity. E. g., *International Brotherhood of Electrical Workers v. NLRB*, 341 U.S. 694, 704, 71 S.Ct. 954, 95 L.Ed. 1299 (1951). If it is primary, in other words directed only at the employer with whom the union has a bona fide labor dispute, then it may be lawful even though some neutral or secondary employers might be affected. Conversely, if its object is to bring indirect pressure on the primary employer by involving neutral or secondary employers and their employees, then it may be unlawful.

*Id.* at 725.

The key to this section, then, is determining the object of the union's picketing. "Intent is inferred from the nature of the acts performed." *Pickens-Bond Constr. v. United Bhd. of Carpenters*, 586 F.2d 1234, 1241 (8th Cir. 1978). This determination becomes much more difficult where, as here, the primary employer and the neutral employer perform separate work at a common situs. The guidelines that the Board established in *Sailors' Union of the Pacific (Moore Dry Dock)*, 92 N.L.R.B. 547, 549 (1950), provide the proper test for determining the legality of union picketing at common situs construction projects. *Int'l Ass'n of Bridge, Etc. v. NLRB*, 598 F.2d 1154, 1156 (9th Cir., 1979). *Moore Dry Dock* established a four-part test to judge the legality of common situs picketing: (a) whether the picketing is limited to times when the situs of dispute is located on the secondary premises; (b) whether the primary employer is engaged in his normal business at the situs; (c) whether the picketing takes place reasonably close to the situs; and (4) whether the picketing clearly discloses that the dispute is only with the primary employer. 92 NLRB at 549.

However, as this court has noted:

[I]t must be remembered that the *Moore Dry Dock* rule is only an evidentiary tool. Thus, "the inference of primary activity raised by compliance with the *Moore Dry Dock* standards may be dispelled if the totality of the circumstances [indicates] the unions' " objective is secondary. (Citations omitted.)

*Int'l Ass'n of Bridge, Etc. v. NLRB* at 1157.

In viewing a union's conduct to ascertain the intent of its picketing, we are also mindful that

While a union has a right to express itself, that expression must be restricted so as to affect only primary employees. In this regard, the Fifth Circuit has adopted a "requirement that the picketing union do everything that is reasonably necessary to insure that secondary employees are not misled or coerced into observing the picket line." *Ramey Constr. Co. v. Local 544, Painters*, 472 F.2d 1127, 1131 (5th Cir. 1973). "[T]his requirement places a heavy burden on the picketing union to convince the trier of fact that the picketing was conducted in a manner least likely to encourage secondary effects." *Id.* We, too, have stated that unions have a "duty to picket with restraint." *Carpenters Local 470 v. NLRB, supra*, 564 F.2d at 1363; accord, *Local 98, United Ass'n of Journeymen v. NLRB*, 497 F.2d 60, 65 (6th Cir. 1974). We think that this principle is also applicable to other conduct of members and officials of a union engaged in a labor dispute at a common situs job project. The Union here had a duty to act with restraint.

*Int'l Ass'n of Bridge, Etc. v. NLRB* at 1159.

Here the Board found that the Union's picketing met the *Moore Dry Dock* criteria.

"The issue . . . [was] . . . whether it exceeded the permissible limits of criterion 'c' and revealed an intent to appeal to employees of a neutral employer." It answered this question in the negative based on *In the Matter of Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Truck Drivers & Chauffeurs, Local Union No. 807 (Schultz Refrigerated Service, Inc.)*, 87 NLRB 502 (1949), which it found to be "both factually and legally analogous to the picketing here."

In *Schultz*, the primary employer had a terminal, but ran its transportation business primarily through a large fleet of commercial trucks. The striking employees picketed around the trucks at the pick-up and delivery points at the customers' locations. The Board found that ambulatory picketing to be lawful primary activity because the only way for the union to put pressure on the primary employer was to "picket between the headlights" of the trucks as they made their deliveries to the customers.

 We cannot agree with the Board's conclusion that "*Schultz* is dispositive of the instant matter." *Schultz* did not establish a per se rule; and we have held, as stated in *Int'l Ass'n of Bridge, Etc. v. NLRB* at 1157, "that a per se rule is neither wise nor necessary."

The focus of the inquiry is the object of the Union's picketing. The Board's dissent correctly pointed out that *Schultz* is inapposite as no reserve gate system or other alternative picketing location was established at the premises of any of the neutral employers involved in that proceeding. Here, conversely, the reserve gate, which was properly established, put the Union on notice regarding those areas where it could have easily and effectively restricted its appeal to Allied's employees, without involving the Ashton employees.

 The dissenting opinion of members Penello and Walther was correct in observing that a union's picketing must " 'be so conducted as to minimize its impact on neutral employees [and employers] insofar as this can be done without substantial impairment of the effectiveness of the picketing in reaching the primary employees [and employer].' *Wire Service Guild, Local 222, The Newspaper Guild, AFL–CIO–CLC (The Miami Herald Publishing Company)*, 218 NLRB 1234, 1238 (1975)." (dissent of members Penello and Kennedy) The Board's majority opinion, in applying the *Schultz* standard permitting ambulatory picketing "between the headlights", fails to recognize that the reserve gate provided a reasonable alternative which would have accomplished the legitimate purposes of the picketing, without involving secondary employees. A review of the facts in light of this consideration leads us to the conclusion that the Board's finding that the union's activity did not violate § 8(b) is without substantial evidence to support it, and it is therefore reversed and its enforcement is denied.