320 F.2d 250
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL-CIO, LOCAL NO. 12, Respondents.
 No. 6087.
 United States Court of Appeals First Circuit.
 July 15, 1963.
 
 Melvin J. Welles, Atty., Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., and Judith Bleich Kahn, Attys., Washington, D. C., were on brief, for petitioner.
 Joseph P. Coughlin, Boston, Mass., for respondents.
 Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.
 HARTIGAN, Circuit Judge.
 
 
 1
 This is a petition of the National Labor Relations Board for enforcement of its order issued on July 16, 1962, against respondents, following the usual proceedings under the Act. The Board found that respondents violated Section 8(b) (4) (i) and (ii) (B) of the Act — the socalled "secondary boycott" section of the statute. The facts giving rise to the alleged violations are as follows.
 
 
 2
 Phoenix Urban Corp. was engaged by Charles River Park "A", Inc. — a developer — as general contractor in the construction of an apartment house project in Boston, Massachusetts. The record indicates that in developing the plans and specifications for the project, Charles River and Phoenix decided that gas stoves would be used in the project. Incident thereto, on August 22, 1960, Charles River entered into a contract with the Boston Gas Company, a Massachusetts public utility corporation, providing that the latter, in consideration of the use of gas appliances in the project, would run gas service pipes from the gas main in the public ways up to and through the foundation wall of the apartment buildings. At all times here relevant this agreement was in effect and became part of the principal contract between Phoenix and Charles River. Under this latter agreement, Phoenix's obligations were to insure that the gas lines were installed on the site and supervise their installation.
 
 
 3
 Respondent Local 12 of the Plumbers Union, hereinafter referred to as the Plumbers, and Local 22 of the International Hod Carriers, Building and Common Laborers Union, hereinafter referred to as the Laborers, each had members working on the Charles River construction project for various employers other than Boston Gas. The Plumbers and the Laborers Unions were, in turn, members of respondent Building and Construction Trades Council of the Metropolitan District, hereinafter referred to as the Council.[1]
 
 
 4
 The employees of Boston Gas have been represented by District 50 of the United Mine Workers of America since 1936. Neither the Council, the Plumbers, nor the Laborers represented Boston Gas employees. None of those three organizations had a collective bargaining agreement with Boston Gas, and none of them made any effort to organize Boston Gas employees.
 
 
 5
 About October 6, 1961, John Tobin, business agent of the Plumbers, asked Boston Gas to have its work on the Charles River project done by members of the Plumbers' Union. Boston Gas was noncommittal in its reply. About October 13, Tobin spoke to Cyrus Smith, vice-president of Phoenix and project manager for the Charles River development. Tobin told Smith that any gas piping work that was done on the site and off the public streets, was within the jurisdiction of the Plumbers. Smith told Tobin that Phoenix intended to proceed with Boston Gas employees and Tobin replied that if Boston Gas "came in on the property, he would pull the Plumbers off the job." Shortly thereafter, Boston Gas started excavating near the construction site. The next day Tobin again told Smith that if Boston Gas came on the property Tobin would take his men off the job.
 
 
 6
 On October 19 Tobin contacted Charles O'Reilly, manager of Safety and Legal Services for Boston Gas, stating that he wanted Boston Gas to recognize the Plumbers. O'Reilly replied that Boston Gas had a contract to install the piping through the foundation walls and was going to proceed with its own employees. Tobin then informed O'Reilly that Boston Gas would find itself in serious trouble and would encounter opposition from the Laborers and Hoisting Engineers Union. In the same conversation, Tobin told O'Reilly, "[W]e will use pressure on all the building trades to stop you from doing that work."
 
 
 7
 About October 23 Tobin and John Deady, secretary-treasurer and general agent of the Council, met with Smith. There followed several meetings between officers of the interested parties looking towards an accord. The net result of these meetings was an apparent agreement under which the Plumbers agreed to allow Boston Gas to lay pipes in the "public way" section of the project areas as a result of Smith's concession that when Boston Gas reached the Charles River property, he would stop the job, and Phoenix would do the rest of the work with the Building Trades. Boston Gas in turn agreed that it would lay the pipe in the public way only, and that work within the private property lines would either be done by Phoenix, or would be sub-contracted by that company.
 
 
 8
 Boston Gas began work on November 7 in the area which Smith had referred to as the public way. In the course of the morning Deady and one Pietrangelo, business agent of the Laborers, went to Smith's office where they were later joined by Tobin. Deady told Smith that the job was going to shut down because Boston Gas was working on what Deady considered to be Charles River's property. About this time the union steward for the laborers on the project instructed certain of the laborers who were employed by Phoenix not to resume work after lunch time.
 
 
 9
 After the lunch period about twenty to thirty laborers, all of whom were members of the Laborers Union, and a number of whom worked for sub-contractors of Phoenix, did not resume work. The laborers congregated outside Smith's office. After they had been there about fifteen or twenty minutes, Smith asked Boston Gas to remove its men from the job because "we had a strike on our hands." Immediately thereafter, Boston Gas directed its employees to stop working and informed Smith that it had done so.
 
 
 10
 After Boston Gas informed Smith that it had withdrawn its employees from the project Deady asked Pietrangelo to see if all the Boston Gas employees had left the job and report his findings to Deady. Pietrangelo investigated and found that Boston Gas had left. The strikers thereupon returned to work.
 
 
 11
 Boston Gas did not resume laying pipe into the buildings until an injunction was issued under Section 10(1) of the Act by the United States District Court for the District of Massachusetts on November 22, 1961; the court enjoined interference with the work pending final adjudication of this matter by the Board.
 
 
 12
 On the basis of the foregoing facts, the Board concluded that respondents violated Section 8(b) (4) (ii) (B) of the Act by threatening, coercing or restraining Phoenix with an object of forcing Phoenix, or Charles River, or any other employer to cease doing business with Boston Gas. The Board further found that, with the same object, respondents, in violation of Section 8(b) (4) (i) (B), induced or encouraged the employees of Phoenix and of other employers having contracts with Phoenix at the Charles River development to engage in a strike or a refusal in the course of their employment to perform services for their respective employers.
 
 
 13
 We believe that substantial evidence, on the record considered as a whole, supports the Board's findings. Section 8(b) (4) of the Act, as amended by the LaborManagement Reporting and Disclosure Act of 1959 provides, in pertinent part, that it shall be an unfair labor practice for a union or its agents:
 
 
 14
 "(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment * * * to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is —
 
 
 15
 * * * * *
 
 
 16
 "(B) forcing or requiring any person to cease * * * doing business with any other person * *."
 
 
 17
 The text of this statute thus proscribes, as did the corresponding provision of the 1947 Act, refusals to perform any services, or the inducement of such refusals, when it is the object thereof to constrain one employer to cease doing business with another. The section seeks to avoid the implication of employers in disputes not their own where an object of the union conduct is to force the cessation of business relations between such neutral employers and any other person. For it has been stated that:
 
 
 18
 "* * * The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands. * * *" International Brotherhood of Elec. Workers v. National Labor Rel. Bd., 181 F.2d 34, 37 (2nd Cir. 1950) per Hand, J., aff'd, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).
 
 
 19
 We agree with the Board that the threats by the Plumbers' business agent, Tobin, to officials of Phoenix, that if Boston Gas "came in on the property" Tobin would pull the plumbers off the job, exemplifies the type of conduct which Congress proscribed in Section 8(b) (4) (ii) (B). See, Local 901, Internat'l Bro. of Teamsters, Etc. v. Compton, 291 F.2d 793 (1st Cir. 1961); N. L. R. B. v. Plumbers Union of Nassau County, Local No. 457, Etc., 299 F.2d 497 (2nd Cir. 1962); N. L. R. B. v. Local No. 294, Internat'l Bro. of Teamsters, Etc., 298 F.2d 105, 107-108 (2nd Cir. 1961); N. L. R. B. v. International Hod Carriers, Etc., 285 F.2d 397, 400 n. 3 (8th Cir. 1960), cert. den., 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203. Similarly tainted was the statement by Deady to Smith on November 7 that work on the project was about to stop since Boston Gas was working inside the Charles River property line.
 
 
 20
 However, respondents went beyond mere threats. The record plainly shows that — pursuant to their desire to ban Boston Gas from the project — they induced and encouraged the strike which occurred on November 7. We agree with the Board that the record shows that this strike was called by Deady on behalf of the Council, as well as its members, including the Plumbers' and Laborers' Union. This conduct was in clear violation of Section 8(b) (4) (i) (B). National Labor Relations Board v. Denver Bldg. Council, 341 U.S. 675, 71 S.Ct. 943, 95 L. Ed. 1284 (1951); International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).
 
 
 21
 The Plumbers' Union argues that its real object in the premises was simply to attain an assignment of work to its members by either Boston Gas or Phoenix rather than the cessation of business between those two employers. However, as noted previously, the Board found that an object of the union's threats and inducement of strike activity was to force "Phoenix or Charles River * * * to cease doing business with Boston Gas."
 
 
 22
 Since we believe that the finding is supported by substantial evidence, the union's argument is unavailing. That is to say, that even assuming that the ultimate object of the Plumbers' course of conduct was to attain the assignment of work — once it sought to attain this object by proscribed activity, e. g., the banishment of Boston Gas, it violated the Act. For, as the Supreme Court has stated: "It is not necessary to find that the sole object of the strike was that of forcing the contractor to terminate the subcontractor's contract." National Labor Relations Board v. Denver Bldg. Council, supra, 341 U.S. at 689, 71 S.Ct. at 952.
 
 
 23
 Respondents have placed heavy emphasis on the case of National Labor Rel. Bd. v. United Brotherhood of Carp., 261 F. 2d 166 (7th Cir. 1958). There the court set aside an order of the Board in an anologous situation to that involved in the instant case. However, in that case the court ruled that there was insufficient evidence that the respondent union sought to compel a cessation of relations between the employer and the subject sub-contractor. Unlike that case, here we believe that the evidence compels the conclusion that respondents insisted upon such a cessation of relations and this conduct was violative of the Act.
 
 
 24
 We have considered respondents' other contentions, including that relating to the scope of the Board's order, and believe them to be without merit.
 
 
 25
 For the foregoing reasons, we believe that the findings of the Board are supported by substantial evidence on the record considered as a whole and that the Board's order should be enforced.
 
 
 26
 A decree will be entered enforcing the order of the Board.
 
 
 
 Notes:
 
 
 [1]
 International Hod Carriers, Building and Common Laborers Union of America, AFL-CIO, Local Union No. 22, has complied with the Board's order and is no longer a party to these proceedings