Hugh E. SPERRY, Regional Director of the Seventeenth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

BUILDING AND CONSTRUCTION TRADES COUNCIL OF KANSAS CITIES AND METROPOLITAN AREA, AFL; International Brotherhood of Electrical Workers, Local No. 124, AFL; United Brotherhood of Carpenters and Joiners of America, District Council of Kansas City and Vicinity, AFL; International Hod Carriers', Building and Common Laborers' Union of America, Local 264, AFL; United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, Local 8 AFL; International Association of Bridge, Structural and Ornamental Iron Workers, Local No. 10, AFL; and Brotherhood of Painters, Decorators & Paperhangers of America, District Council No. 3 AFL; and its Constituent Locals, Respondents.

Civ. No. 9716.

United States District Court
W. D. Missouri, W. D.
May 12, 1955.

 

Theophil C. Kammholz, Gen. Counsel, Chicago, Ill., David P. Findling, Associate Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, Washington, D. C., Martin Sacks, Chief Law Officer, Region 17, Kansas City, Mo., Alvin Lieberman, Washington, D. C., for petitioner.

Clif Langsdale and Gibson Langsdale, Kansas City, Mo., for Building and Construction Trades Council of Kansas Cities and Metropolitan Area, AFL; International Brotherhood of Electrical Workers, Local No. 124, AFL, United Brotherhood of Carpenters and Joiners of America, District Council of Kansas City and Vicinity, AFL; and International Hod Carriers', Building and Common Laborers' Union of America, Local No. 264, AFL.

John J. Manning and Robert S. Fousek, Kansas City, Mo. for United Association of Journeymen & Apprentices of the Plumbing & Pipe Fitting Industry of the United States and Canada, Local No. 8 AFL; Brotherhood of Painters, Decorators & Paperhangers of America, District Council No. 3 AFL and its Constituent Locals, and International Association of Bridge, Structural & Ornamental Iron Workers, Local No. 10, AFL.

DUNCAN, Chief Judge.

Petitioner, on behalf of the National Labor Relations Board, instituted this suit against the respondents, pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, June 23, 1947, 61 Stat. 136, 29 U.S.C.A. § 141 et seq., alleging unfair labor practice on the part of the respondents in violation of Section 8(b) subsection 4(A) of the Act aforesaid, and seeking appropriate injunctive relief against the respondents.

On or about April 13, 1955 pursuant to the provisions of the Act, the United Contractors Council filed an amended charge with the Board to a charge originally filed on December 4, 1954, charging among other things that respondents had "engaged in, and are engaging in, unfair labor practices within the meaning of Section 8(b), subsection 4(A) of the Act." The charges were referred to the

"petitioner as Regional Director of the Seventeenth Region of the Board for investigation and were investigated by petitioner and under his supervision."

\* \* \* \* \* \*

"After such investigation, petitioner has reasonable cause to believe that respondents have engaged in, and are engaging in, conduct in violation" of the section aforesaid.

The complaint was verified by the petitioner Sperry.

The United Contractors Council is an organization of employers engaged in the construction industry whose places of business are in Kansas City, Missouri, and whose employees are members of the United Construction Workers Local 787, United Mine Workers of America, District 50. It was alleged that

"Since on or about March 28, 1955, United, on behalf of its members, has bargained collectively with District 50. \* \* \*"

and further that prior to March 28, 1955, United bargained collectively with Construction Workers Local 73, and United Stone & Allied Products Workers of America, CIO. Further, that

"During the year 1954, the members of United supplied materials and performed services in excess of the value of $100,000 outside the State of Missouri."

On April 18, 1955, the respondents United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, Local No. 8, American Federation of Labor; International Association of Bridge, Structural and Ornamental Iron Workers, Local No. 10; American Federation of Labor; and

Brotherhood of Painters, Decorators and Paperhangers of America, District Council No. 3, American Federation of Labor, and its Constituent Locals, filed an answer in which they denied that the petitioner had reasonable cause to believe that the charges set out in the amended charge were true in so far as it alleged that those respondents had engaged in or were engaging in any unfair labor practices in violation of Section 8(b) subsection 4(A) of the Act.

These three respondents admitted in their answer that:

"the employers as members of the United Contractors Council are engaged in business affecting commerce within the meaning of Section 2, subsection 6 and 7 of the Act."

On April 20, 1955, and prior to the time the case went to trial, the last above named respondents filed a Motion to Dismiss, alleging that:

"The above named labor organizations having filed their answer admitting the jurisdiction of this court but denying that they had engaged in the alleged practices;

"The aforesaid United Contractors Council having on April 18, 1955 withdrawn their charges against the above named labor organizations and the National Labor Relations Board having approved this withdrawal request:

"It hereby is respectfully moved that this court dismiss the petition in so far as it applies to the above named labor organizations."

Prior to announcing ready for trial, petitioner joined in the motion of these respondents and requested a dismissal in accordance therewith. The motion was sustained, and the cause dismissed as to those respondents, leaving as the sole respondents, the Building and Construction Trades Council of Kansas Cities & Metropolitan Area, AFL; International Brotherhood of Electrical Workers, Local No. 124, AFL; United Brotherhood of Carpenters & Joiners of America, District Council of Kansas City

& Vicinity, AFL; and International Hod Carriers', Building & Common Laborers' Union of America, Local No. 264, AFL.

These respondents admitted the picketing for a short period by the IBEW of three of the "projects under construction by Klassen, Elbel and Nance," but denied that the contractors involved in the controversy here were engaged in commerce "or in a business affecting commerce as defined by Section 2, paragraphs (7) and (8) of Title I of the Labor Management Relations Act of 1947," and denied that they had engaged in any unfair labor practices.

These respondents further alleged that the members of United Construction Workers Local 787, United Mine Workers of America, District 50, had "not complied with the requirements or prerequisites to exercise of statutory rights of unions as provided by Section 9(h) of the Act." They further allege—"that the United Contractors' Council, which employs only members of said noncomplying union, is not entitled to have the National Labor Relations Board bring this action in its behalf," and denied violation of the Act.

The United Contractors' Council is a voluntary unincorporated organization composed of 37 contractors and builders, the majority of whom or which are electrical contractors. It was organized by this group of contractors for the purpose of collectively bargaining with the members of what originally was Construction Workers' Local No. 73, United Stone & Allied Products Workers of America, CIO, later to become members of United Construction Workers Local 787, United Mine Workers of America, District 50.

The controversy arises out of four construction projects in Jackson and Clay Counties, adjacent to Kansas City, on which six contractors, Ward Electric Co., Klassen Construction Co., Inc., Eyring Electric Co., Elbel Construction Co., H. E. Moore Electrical Co., and Nance Development Co., were engaged. Ward Electric, Eyring Electric and H. E. Moore Electrical are electrical contrac-

tors and members of United Contractors Council. The others are general construction contractors and are not members of United.

Ward Electric Company, a member of United and engaged in the electrical contracting business, is located in Kansas City, Missouri. Ward's employees are members of District 50. During the year 1954, Ward supplied materials and performed services of the value of in excess of $33,000 outside the State of Missouri.

Klassen Construction Co., Inc., whose principal office is located in Overland Park, Kansas, is engaged as a general contractor in the construction of a housing project known as Loma Vista, located in or near Kansas City, Missouri. In the construction of this project, materials originating outside the State of Missouri valued at in excess of $375,000 have been or will be used.

In or about November 1954, Klassen entered into a contract with Ward for the performance by Ward of the electrical work on the Loma Vista project.

Eyring Electric Co., a member of United and engaged in the electrical contracting business, is located in Kansas City, Missouri. Eyring's employees are members of District 50. During the year 1954, Eyring supplied materials and performed services of the value of in excess of $17,000 outside the State of Missouri.

Elbel Construction Co., whose place of business is located in Kansas City, Missouri, is engaged in and about Kansas City, Missouri, as the general contractor in the construction of the Antioch Shopping Center, and two housing projects, known as Vineyard Valley, and Elmwood Terrace, materials originating outside the State of Missouri valued at in excess of $500,000 have been or will be used.

Elbel has contracted with Eyring for the performance by Eyring of the electrical work on the Antioch, Vineyard Valley, and Elmwood Terrace projects.

H. E. Moore Electric Company, a member of United and engaged in the electrical contracting business, is located in Kansas City, Missouri. Moore's employees are members of District 50. During the year 1954, Moore supplied materials and performed services of the value of in excess of $12,000 outside the State of Missouri.

Nance Development Company, whose principal office is located in Kansas City, Missouri, is engaged as the general contractor in the construction of a housing project known as Nance's Third Addition, located in or about Kansas City, Missouri. In the construction of this project materials originating outside the State of Missouri valued at in excess of $500,000 have been or will be used.

The general contractors, Klassen, Elbel and the Nance Development Company in their general construction work on all of these projects, employed labor whose locals were members of the Building and Construction Trades Council of Kansas Cities and Metropolitan Area, AFL, except electrical workers.

Klassen Construction Company contracted with the Ward Electric Company to do the electrical work in connection with the construction of the Loma Vista projects, and Nance Development Company employed without written contract, the H. E. Moore Electric Company to do the electrical work on the Nance Third Addition project. All of these electrical contractors employed electricians who were members of District 50.

As might well have been anticipated, labor difficulties were immediately encountered when the members of the different labor groups were attempted to be brought together on the same project. As soon as the electrical work began, the projects were picketed by the IBEW 124 and the members of the other crafts, carpenters and laborers, refusing "to work behind the banner," left the job.

The first picketing on the Antioch project by IBEW was on February 14, 1955. About noon of that day the business manager for the carpenters came on the job and said to the carpenters,—

"it wasn't the policy to work behind the banner regardless of whose Banner." The carpenters and laborers immediately left the job. On February 17 a restraining order was issued by the State court and served upon the picket and he immediately left. As soon as he left, the carpenters and laborers came back.

Shortly thereafter the restraining order was dissolved and the picket came back and continued until again restrained, by the State court on April 4.

From the time the picket came back following the dissolving of the restraining order issued on February 17, the carpenters and laborers did not return to work again until April 5, after another restraining order by the State court on April 4.

At this time there are temporary restraining orders against the respondents, issued by the State court upon the petitions of the principal contractors.

On April 5, the day following the restraining orders, the carpenters and laborers left the projects and have not returned, although there has been no picket since April 4. Picketing on all the projects followed pretty much the same pattern, except one where there was no picketing at any time.

On Wednesday, March 29, 1955, while the IBEW picket was on the project, several men, probably four, came by in an automobile and tried to persuade him to abandon the picketing. He testified that they told him if he wanted a job, he could have it; he declined and they said they would be back the next day with enough men to see that the picketing was stopped.

On Thursday, March 30, 1955, about 7:30 a. m. when the picket arrived to start his day's work, a number of cars containing men who were identified as members of District 50 were already on the project. The evidence shows that some 20 to 30 cars arrived and were parked along the highway where the picket usually walked, and that from "40 to 100" men were in them; that they refused to permit the picket to alight from his car to begin his day's

picketing; that he called the office of his Union, IBEW and reported the incident.

Four cars of police and a motorcycle officer arrived upon the scene shortly after 8:00 o'clock. Immediately the IBEW picket began his day's work. A second picket of the IBEW also came and he likewise picketed the electrical work. Shortly after the police arrived the men who had gathered began to disperse, and by 3:30 there were only a few left, and they had not made any threats or attempted in any manner to interfere with the picket. At the end of the day at their request, the pickets were escorted into Kansas City by one of the police cars.

On the following morning, Friday, March 31, 1955, the picket was back on the job. There were no persons present to interfere with him during the entire day; there were no threats of any kind at any time made by any of the men who gathered there on the 30th against any of the carpenters or laborers. The evidence fails to reveal that any of the carpenters or laborers were working on that day because of the presence of the picket.

A person who was identified as a steward of District 50 is alleged to have said that if necessary, they could bring enough men in to take over the whole project. Apparently it was more of a boast than a statement of fact or a threat.

On Monday, April 4, 1955, the picket was back on the job without any interference. None of the persons who had gathered there on the previous Thursday were present. It was a peaceful, uninterrupted picketing. The carpenters and laborers were not working because of the presence of the picket. Some time Monday, probably before noon April 4, the picket was served with the injunction notice which had been obtained in the State court. He left immediately.

On Tuesday, April 5, 1955, the carpenters and laborers came back on the job, but about noon the carpenters were notified by their stewards, pursuant to directions from their president, J. O. Mack, to leave the project to attend a

meeting at the hall. Pursuant to those instructions from their officers, they left the project to attend the meeting. The evidence reveals further that there were a few laborers on the project; that it was reported to their business representative that they were a little nervous about what was going on, or what to do; they likewise were notified to leave the job; some of them went to their hall and some went home. Just what took place at the meeting is not very clear. Memories are not too good, and apparently no minutes were kept. J. O. Mack, testified (referring to the Antioch project)

> "I advised with them and they advised with me it was dangerous to work on the job as long as there was violence or possibility of violence on the job."

> "I think there was threats made by a man—all of them talked about an individual that was over there that was the steward of the United Mine Workers on the job, said to get these fellows off of the job and we will take over the job even if we have to bring them in from Illinois."

This was with respect to what was said at the gathering on the previous Thursday. The same witness testified that he had heard of no further threats after that time. The laborers followed the lead of the carpenters and each group was taken off the projects following this meeting.

Although there has been no picketing on any project since that time because of the injunction of the State court, and no further threat of violence of any kind or character, there has been no move on the part of the carpenters and laborers to return to any of the projects, and there had never been any show of violence or opposition of any character to the picketing of any of the other projects, which were far removed from the Antioch project.

Evidence of the witness Mack also reveals that there was a special meeting of the Building and Construction Trades Council, probably on Monday, April 4, at which the trouble referred to above was discussed. Likewise the meeting of the 5th, the evidence with respect to this meeting is rather sketchy and not very enlightening. However, I think it may reasonably be inferred from the testimony that they did discuss the trouble, particularly on the Antioch project, and the trouble between the electricians and District 50.

The Building and Construction Trades Council is made up of all of the construction crafts (53 in number), who are members of American Federation of Labor, and J. O. Mack is president of this organization, as well as the Carpenters Union. He testified that most of the members of the group were present at this called meeting. This question was asked of President Mack:

> "All right. Let me ask you this question, then: Did the discussion at the meeting concern itself with whether the crafts represented men working in the crafts and in the unions represented on the Building and Construction Trades Council should work on jobs at which United Mine Workers' electricians were working? A. It wasn't put in that way, no.

> "Q. How was it put? A. We discussed the possibility of our people getting into internal strife on the jobs, and individually we decided to take our people off of the jobs that were in discussion, namely, the three that you are talking about."

The carpenters and laborers seem to have been the only members of the Building and Construction Trades Council to withdraw their men from the projects.

■ Petitioner does not deny that a union may picket if it complies with certain requirements enunciated by the Board in Moore Dry Dock Company, 92 N.L.R.B. 547, 549. These requirements are:

> "(a) The picketing is strictly limited to the times when the situs

of the dispute is located on the secondary employer's premises.

"(b) At the time of the picketing the primary employer is engaged in its normal business at the *situs*.

"(c) The picketing is limited to places reasonably close to the location of the *situs*."

Apparently the only complaint with respect to these requirements made by the petitioner is that on one occasion the pickets on the Loma Vista project were present when the employees of the electrical contractor were not working or present. The evidence is conflicting on this question. The picket testified that there was present during the course of the picketing, one of Ward's trucks. Apparently there was no intention on the part of the picket to picket the project while some of the employees of the electrical contractor were not present.

The banner carried at the Antioch project contained the following wording:

"The Ward Electric Company does not pay the prevailing wage rate or recognize all other conditions of employment established by IBEW Local Union 124, AFL."

The banner carried on the Vineyard Valley Project and Nance's Third Addition, bore the following lettering:

"Electrical work on this job is being performed by electricians who are not members of IBEW Local Union 124 AFL."

■■ So far as the situs of the picketing was concerned at all the projects, it was not violative of any requirements enunciated by the Board, and the banners bearing the name of the contractor doing the electrical work were not misleading or in violation of the regulations.

■ I think, however, that the banners which did not bear the name of the electrical contractor were improper. It would be impossible from a reading of the lettering on these banners, to determine who was doing the work, whether it was the principal contractor or the subcontractor. It could well have been interpreted to have referred to the principal contractor, with whom the IBEW claims to have had no dispute.

There is no direct evidence showing any collaboration between the IBEW and the carpenters or laborers. There was a telephone conversation between William L. Nance, secretary-treasurer of the Nance Development Company and Andrew Harvey, business manager of the IBEW. Nance testified that after the picketing started on the Nance project, he called Harvey and talked to him on the telephone.

"I said I was desirous of finding out the difficulties and if we couldn't possibly straighten it out. * * * and Mr. Harvey * * * said the only thing he was interested in was the 124 contractor on the job, that is the Local 124 contractor on the job and he asked me—* * * he asked me if I had a contract with Harold Moore and I said no contract with Harold Moore, * * * so we got to talking about it and finally I asked him what we should do to pull the picket off. I said I have put a lot of conversation on this injunction but that is the last thing I want to do is to file an injunction. 'Well,' he said, 'All we are going to have to do is to get a 124 contractor on the job.' "

There was no denial of this conversation on the part of Harvey. The implication would seem to be that one of the objects of the picketing was to cause Nance to "cease doing business with any other person"—namely, the H. E. Moore Electric Company.

The only fact really in dispute is the reason why the carpenters and laborers were taken off the job * * * was it because of the fear of violence, or was it for the purpose of forcing or requiring their employer to cease doing business with the subcontractor.

■ The question for this court to determine is whether or not, after investigation, the petitioner had reasonable cause to believe that an unfair labor practice had been committed, and if so, whether or not a temporary restraining order should be granted.

It is not necessary for the Court to determine whether or not the facts alleged are true or false. That is the sole function of the National Labor Relations Board. The hearing was full and complete. Both sides were given every opportunity to present every phase of their contention, resulting in a record of 376 pages.

Respondents question the jurisdiction of the Board and of this Court; the sufficiency of the investigation by the Director; the competency of the complainant to file the complaint with the Board, and the adequacy of the evidence to show reasonable cause to believe that an unfair labor practice had been committed.

Whatever my personal views with respect to the question of jurisdiction may be, are of no concern. The Courts have discussed the question of whether commerce is affected under such circumstances as herein found to exist, on many occasions and have brought within the jurisdiction of the Act, practically all construction projects unless the amount involved is so small as to come within the rule of *de minimis*, and that is not true here. National Labor Relations Board v. Denver Building & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299. There are many other cases, but the holding in those cases apparently are determinative of the question, so in conformity with them, I must hold that there is reasonable cause to believe that the Board has jurisdiction.

The next question is the extent of the investigation by the Director. The respondents contend that the investigation was not adequate or sufficient to justify the filing of the complaint, because the Director or those serving under him, did not talk to the officers of the respondents.

In conducting its investigation it is not necessary for the Director to determine the ultimate fact, but only whether or not there is reasonable cause to believe that there has been an unfair labor practice, and I know of no formula or fixed rule for making that determination. He is only required to satisfy himself that reasonable cause exists to believe that an unfair labor practice has been committed. He need not exhaust all sources of information. Such investigation does not demand the thoroughness that would be expected in a hearing.

The Court may assume that the Director had in his possession at the time the action was taken by him, all of the facts and information which were subsequently presented to the Court in an effort to obtain a temporary restraining order. This contention must likewise be resolved against the respondents.

Next is the question of the competency of the United to file the complaint. It is contended that District 50 has no standing before the Board because it has not complied with the law respecting the signing of non-Communist affidavits by its officers. Upon objection of the respondents here that it was not a question for the consideration of this Court, but for the Board, it was stipulated that the records of the Board, if admitted in evidence, would not show that District 50 had complied with the law in the respects above mentioned.

Of course, the employees here did not file the complaint, and the employees are not members of the United Contractors Council which did file the complaint. United Contractors Council represents the contractors who are its members, and not United Mine Workers District 50 who it is alleged are in non-compliance. So also must this contention be resolved against the respondents.

We now come to the final question as to whether or not there was reasonable cause on the part of the Director to believe that an unfair labor practice had been committed by the respondents. Although the evidence, as heretofore briefly quoted, shows that there was a meeting of the Building and Construction Trades Council in which the subject of this controversy was discussed, it was not sufficient to show that the Building and Construction Trades Council was

guilty of any unfair labor practice. Whatever action was taken by the carpenters and laborers and the electricians was on their own initiative. I think this is more clearly borne out by the fact that the three respondents who were dismissed from this proceeding, some of whom returned to work, were also members of the Building and Construction Trades Council.

The Motion to Dismiss, offered at the close of all of the evidence by the respondents will be, and is hereby sustained as to the Building and Construction Trades Council.

 If the carpenters and laborers simply did not want "to work behind the banner" they had a right not to do so, of course. Or, if they were withdrawn by their business agents and representatives because of the fear of violence, that likewise would not be an unfair labor practice. It is not necessary that the sole object of the strike on the part of the carpenters and laborers was to force the principal contractor to terminate the contract of the subcontractor. National Labor Relations Board v. Wine, Liquor & Distillery Workers Union, 2 Cir., 178 F.2d 584; National Labor Relations Board v. Denver Building & Const. Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 951, 95 L.Ed. 1284. If one of the objects of the strike was for the purpose of:

"forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person"

it would be an unfair labor practice. This rule applies equally to the IBEW in its picketing. Even peaceful picketing may be a violation and an unfair labor practice if one of its objects is to bring about a secondary boycott or is

"to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is:

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;"

 The Director was entitled to indulge in all reasonable presumptions that might be drawn from the facts surrounding the actions of the parties. Up to the time of the final withdrawal of the carpenters and laborers from the various projects, there were no facts that would justify a reasonable belief that any unfair labor practice has been committed.

 Until the work had progressed to the place where the electrical work was required, no disputes arose, because there was no dispute of any kind or character between the carpenters and laborers and their employers, but as soon as the electricians came upon the project and were picketed, the carpenters and laborers left. They stayed away as long as the picket remained. When the picket left, the carpenters and laborers returned, until their final withdrawal on April 5, the day following the last temporary restraining order by the State Court. The picket had been taken off on April 4, and the carpenters and laborers as usual returned on the 5th. There were no pickets there at that time.

The carpenters and laborers left pursuant to the orders of their officers and business agents; they have remained away since that time, although no pickets have been upon the premises, no evidence of violence existed, no threats have been made or even suggestions of threats; there has been nothing to pre-

vent the carpenters and laborers from returning to any of the projects without the slightest fear, if they had any, of violence or interference from any person or group. Certainly there was no evidence of any interference or threats of any kind or character at any time on the other three projects. They were many miles distant from the Antioch project. Notwithstanding that fact, the carpenters and laborers were removed by their officers on the same day that the carpenters and laborers were ordered off the Antioch project. If there had been any real threat of danger it was past, and not imminent at the time they were removed. The Director must have learned these facts upon investigation.

▆▆▆▆ As to the electricians, of course, they knew during all the time the picketing was in progress that the carpenters and laborers were refusing to work. This of itself would not justify the belief that one of the objects of the picketing was to cause the carpenters and laborers to leave their employment for the purpose of causing their employers to cease doing business with the subcontractor.

By taking into consideration all the facts and circumstances, particularly the undisputed statement of the business agent of the IBEW that "All we are going to have to do is to get a 124 contractor on the job" would indicate that one of the objects of the picketing was to induce the principal contractors to cease doing business with the subcontractors, and in that respect was guilty of an unfair labor practice.

Apparently it was the object of respondents to force or require Klassen, Elbel, Nance and other employers to cease doing business with Ward, Eyring and Moore, and if such practices continue, they will tend to lead to labor disputes burdening and obstructing commerce and the free flow of commerce, and it may fairly be anticipated that unless restrained, the respondents will continue their unfair labor practices.

Based upon the foregoing facts, it is therefore my conclusion that:

1. This Court has jurisdiction of the parties and of the subject matter of this proceeding, and is empowered to grant injunctive relief under Section 10(l) of the Act.

2. Respondents are labor organizations within the meaning of Section 2(5), 8(b) and 10(l) of the Act.

3. There is, and petitioner has reasonable cause to believe that: (a) Klassen, Elbel, Nance, and United are engaged in commerce within the meaning of Section 2(6) and (7) of the Act.

(b) Respondents, IBEW, Carpenters Union, and Laborers Union, have engaged in, and are engaging in, unfair labor practices within the meaning of Section 8(b), subsection 4(A), of the Act, affecting commerce within the meaning of Section 2(6) and (7) of the Act, and that a continuation of such practices will impair the policies of the Act as set forth in Section 1(b) thereof.

4. To preserve the issues for the determination of the Board as provided in the Act, and to avoid irreparable injury to the policies of the Act and to the public interest, it is appropriate, just, and proper that, pending the final adjudication of the Board with respect to this matter, respondents, IBEW, Carpenters Union and Laborers Union, their officers, agents, servants, employees, attorneys, acting in concert or participation with them, be enjoined and restrained from the commission of the acts and conduct set forth above, acts in furtherance or support thereof and like or related acts or conduct, the commission of which in the future is likely or may fairly be anticipated from respondents' acts and conduct in the past.

Each of the parties has submitted suggested Findings of Fact and Conclusions of Law. In so far as such Findings of Fact and Conclusions of Law are not included or adopted or otherwise determined in this Memorandum Opinion, Findings of Fact, and Conclusions of Law, they are refused.

Judgment will be entered accordingly.