The **KROGER COMPANY**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

**NATIONAL LABOR RELATIONS BOARD**, Petitioner,

v.

**PLUMBERS, STEAMFITTERS, & PIPEFITTERS LOCAL NO. 155**, Respondent.

Nos. 72–1598 and 72–1737.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1973.

Decided May 2, 1973.

J. Mack Swigert, Taft, Stettinius & Hollister, Cincinnati, Ohio, for The Kroger Co. by Stanley R. Zirkin, N. L. R. B.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., John J. A. Reynolds, Jr., Director, Region 26, N. L. R. B., Memphis, Tenn., for N. L. R. B.

Tom Gentry, Little Rock, Ark., J. Mack Swigert, Taft, Stettinius & Hollister, Cincinnati, Ohio, for Plumbers, Steamfitters, and Pipefitters Local No. 155.

Before WEICK and McCREE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

This litigation began with a charge by the Kroger Company that Plumbers, Steamfitters & Pipefitters Local No. 155 was guilty of violating Section 8(b)(4)(i)(ii)(A) and (B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)). The misconduct charged arose from the Kroger Company occupying a store built by its landlord at a shopping center in North Little Rock, Arkansas. Such misconduct consisted of picketing the Kroger store and the distribution of handbills at entrances to the shopping center; it began on the day that Kroger opened its store on July 27, 1971.

The trial examiner, affirmed by the Board, held the picketing was a violation of Section 8(b)(4)(ii)(B) of the Act, but did not violate Section 8(b)(4)(i)(ii)(A) or Section 8(b)(4)(i)(B) of the Act, and that the distribution of the handbills was a protected activity under the proviso contained in Section 8(b)(4) of the Act—information picketing. We have consolidated the Board's petition for summary enforcement of its finding of violation—our No. 72–1737—with Kroger's petition for review of the Board's finding that the distribution of handbills in combination with picketing was not a violation of the Act—our No. 72–1598. Local 155 filed no exceptions to the trial examiner's findings, and has not appeared or filed a brief to this Court. It apparently took no part in the proceedings before the trial examiner, and made no effort to justify its alleged misconduct.

We grant enforcement of the Board's order as to the Section 8(b)(4)(ii)(B) violation and remand the matter to the Board to grant the relief asked by Kroger's Petition for Review. Such an order would require Local 155 to cease and desist from picketing and passing out handbills. The only contest between Kroger and Local 155 derived from Kroger's failure to yield to the union's request that it incorporate into any lease made by it a requirement that Kroger's landlord use only building contractors whose employees were members of a building trades union. All of Kroger's employees are members of an appropriate union and it hires only union men or

contractors to do any necessary repair or other work at its stores.

These are the background facts. The construction at the involved shopping center was financed by Metropolitan Trust Company (Metro), the owner of the building site. Metro had engaged Rock Steel Building Company, Inc. as general contractor to erect the center. Part of the work was performed by West Rock, Inc., a wholly owned subsidiary of Rock Steel. Neither Rock Steel nor West Rock was unionized. Kroger's involvement was that it had leased from Metro part of one of the buildings that was being constructed by Rock Steel and its subsidiary. Kroger was going to operate a retail food store and had no control over its construction since Rock Steel was under contract to Metro.

Sometime around January 11, 1971, the union commenced picketing at the job site with placards that read:

"Local Union No. 155, Plumbers and Steamfitters, for informational purposes is picketing West Rock, Incorporated, as it does not meet the standard of wages, hours and working conditions established by Local 155 in this area."

West Rock filed an unfair labor practice charge against the Local, but it was later withdrawn.

During this same period, and in mid-January, 1971, the local union's business manager, J. W. Woodson, contacted James Patterson, Kroger's division construction engineer. Woodson asked if Patterson knew that a "non-union pipe-fitter [was] being employed" at the site. Patterson was unaware of this and advised Woodson that it was Kroger's policy to employ only union help and that if there was any problem at the site he should talk with either Metro or Rock Steel. Woodson then indicated that Kroger should incorporate a clause in its leases whereby any buildings it was to lease could only be constructed by union labor. Patterson said that this was outside his field and that he did not think that Kroger would place such a limita-tion in its leases. Woodson then told Patterson:

"This is a very strong union neighborhood and I think it would be very detrimental to the Kroger Company if there were any picketing out there."

Construction of the leased building was completed and Kroger opened its store for business on July 27, 1971. At about 8:00 A.M. on the opening day, the store manager observed two pickets, one stationed at each of the two entrances to the shopping center. There was a third individual who was placing handbills on the windshields of the cars in the parking lot. The placards of the pickets read:

"The building occupied by Kroger-Sterling Stores & others on this site were [sic] constructed by Contractors paying less than the established wage scale for plumbers and steamfitters in this area . . . . Plumbers and Steamfitters Local Union No. 155."

The handbills contained the legend "Notice to the Public," and went on to say:

"The building housing the Kroger, Sterling Stores, and others was constructed by some contractors who paid their employees less than the prevailing wage rates paid for similar work in the Little Rock area.

"Our organization has continuously sought to improve the wages and working conditions of employees in the Little Rock area. We are believers in 'Wages not Welfare'. We believe that everyone who works is entitled to be paid a reasonable wage for his efforts.

"We further believe that employers who cut wages and attempt to reduce the earning power of the workers in our area are contributing directly to a situation which ultimately costs all of us tax monies.

*"We believe these are facts that you should consider in making your decisions as to whether or not you would want to patronize an establishment built under such conditions.*

"Plumbers & Steamfitters Local No. 155." (Emphasis supplied.)

These handbills were also distributed to persons coming into the shopping center. While the picketing and handbilling continued, Kroger required the services of several companies—all union shops—to come to its store to make repairs to equipment there. One company, however, did its work, but only after the pickets had left for the day. Another company, John B. Dyke, had to have its work performed by another concern, Plant Electric, when one of Dyke's own employees failed to make the necessary repairs. Dyke had sent its employee, William Russell, business agent of the local representing Dyke's employees, to the Kroger store to make the repairs. At the hearing Kroger attempted to show that Russell refused to cross the picket line, but this testimony was rejected by the hearing examiner as being hearsay. Whatever caused Russell to not do the repair work assigned to him, his conduct necessitated Dyke to employ another company to do it instead of simply sending another one of its own men. It is a fair inference that the presence of the pickets was the cause of Russell's failure to do work at the Kroger store. The picketing was effective.

An inference fairly drawn from these facts supports a finding that the union's picketing and handbilling, although directed at the consumer, did in fact induce individuals to refuse to perform or to delay the performance of their services in sympathy with the union. Such purpose is a violation of Section 8(b)(4)(i)(B) of the Act. American Bread Company v. NLRB, 411 F.2d 147 (6th Cir. 1969).

Aside from the invitation and pressure upon repairmen and others not to enter the picketed premises of Kroger, the more serious and ominous objective of Local 155's activities was, by its handbills, to suggest to proposed customers of Kroger not to patronize its store. After reciting that the building newly occupied by Kroger had been constructed by contractors who paid less than prevailing union wages, the handbill said to the prospective customers that such facts should be considered by them in deciding "whether or not you want to patronize an establishment built under such conditions." This was clearly an invitation to the public to boycott the Kroger store.

It is difficult to envisage just what Kroger could then do to assuage Local 155. Its choices were either to vacate the store built by its landlord, thereby breaching its lease and exposing itself to dire consequences, or to make an agreement with Plumbers, Steamfitters and Pipefitters to require every prospective landlord to employ only union contractors or Kroger would not do business with them.

We think the picketing and the handbilling must be related to the conversation and conduct in January, 1971, whereby the Local 155 picketed the construction site and sought to persuade Kroger to incorporate in all of its leases a condition that it would occupy no building constructed by a nonunion contractor. What happened, then, in July, 1971, was but fulfillment of the January suggestion that "it would be very detrimental to the Kroger Company if there were any picketing out there." Kroger was already committed by contract to occupy the building being constructed for it by its landlord. Whichever horn of the dilemma Kroger chose—an immediate cessation of business with Metropolitan Trust Co., or a promise to cease doing business with Metro or any other future landlord who used non-union contractors —it would be joining in a violation of Section 8(b)(4)(i)(ii)(A) of the Act. These sections proscribe inducement or encouragement of any individual employed in commerce in a refusal "to perform any service" where an object thereof is to force an employer—here Kroger—to enter into any agreement "prohibited by Section 8(e)," which Section also proscribes union conduct having an object of forcing a person en-

gaged in commerce "to cease doing business with any other person."

Certainly, the picketing here was designed to induce, and was in some degree successful in inducing, others not to perform services for Kroger. It is clear also that an objective of the union's conduct was to coerce or induce Kroger "to cease doing business with" Metropolitan. Section 8(e) provides:

"(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer [here Kroger] ceases or refrains or agrees to cease . . . doing business with any other person [Metropolitan and other landlords of Kroger]."

The 1971 request of the union that Kroger cease doing business with any other person—including a landlord—who would not agree to use only union labor cannot, in our view, be disassociated from the picketing and handbilling of July and August 1971. The trial examiner did attempt such disassociation.

"I do not find that Kroger was required to enter into any agreement prohibited by Section 8(e). Woodson did suggest that Kroger have put in its lease language requiring the lessor to use union contractors but this *casual suggestion was never pursued.* I would not find a separate unlawful objective on evidence *as tenuous as this.*" (Emphasis supplied.)

We consider that the picketing and handbilling cannot be separated in their objectives. The examiner's order appears to us to be inconsistent with his exoneration of Local 155 of violation of Section 8(b)(4)(i)(ii)(A) and Section 8(b)(4)(i)(B) of the Act, and inconsistent with his holding that the handbilling was a protected activity. His order requires that Local 155,

"1. Cease and desist from threatening, coercing and restraining the Kroger Co., or any other person engaged in commerce, where an object thereof is to force The Kroger Co., to cease doing business with Metropolitan Trust Company and/or to force Metropolitan Trust Company to cease doing business with Rock Steel Building Co., or any other person engaged in commerce."

No purpose would be served by extensive review of relevant authorities or dissertation of the facts and law here involved. We find the language contained in the dissent of Board Member Ralph E. Kennedy a clear explication of our views. He said, in part:

It is well settled that the words " 'induce or encourage' are broad enough to include in them every form of influence and persuasion." International Brotherhood of Electrical Workers, Local 501, et al. v. N. L. R. B., 341 U.S. 694, 701–702 [, 71 S.Ct. 954, 95 L.Ed. 1299]. It is likewise well settled that no proof of success or effectiveness of the picketing in creating a work stoppage is necessary in order to establish a violation. N.L.R.B. v. Associated Musicians, Local 802, AFL, 226 F.2d 900 (C.A.2, 1955), cert. denied 351 U.S. 962 [, 76 S.Ct. 1025, 100 L.Ed. 1483]. In the instant case, the mere presence of the picket line was sufficient to constitute inducement or encouragement of individuals employed by Kroger, Price Fuel Electric, Arkansas Sign and Neon Company, John B. Dyke Company, and others. In any event, an inference is warranted that the picket line was effective, at least insofar as the Dyke door equipment repair incident is concerned.

I am also of the view that the failure of the Trial Examiner to find that the distribution of handbills, containing substantially the same message as the picket placards and conducted simultaneously and in generally the same area as the picketing, was tantamount to picketing and was unprotected by the Act was erroneous. In Lumber and Sawmill Workers Local Union No. 2797 (Stoltze Land & Lumber Company), 156 NLRB 388, the

Board found that the distribution of handbills in circumstances strikingly similar to those involved here amounted to picketing. Similarly, in Lawrence Typographical Union No. 570 a/w International Typographical Union AFL-CIO (Kansas Color Press, Inc.), 169 NLRB 279, enfd. 402 F.2d 452 (C.A. 10, 1968), the Board found that handbilling in circumstances where it constituted a part of the union's campaign, which included picketing, also constituted picketing. See also Nashville Building and Construction Trades Council Castner-Knott Dry Goods Store, 188 NLRB No. 69.

I must also dissent to the failure of my colleagues to find that Respondent's conduct here had *an* object of forcing or requiring Kroger to agree that in the future all construction work on buildings to be occupied by it would be done by union contractors or subcontractors, and that in the event Kroger leased space from an owner or a developer of a shopping center its lease would provide for a union-built facility. To me, this object is implicit both from Respondent's picketing and handbilling here, such conduct having occurred after the store had been completed and opened for business, and from the conversations early in January 1971, between Respondent's Business Manager Woodson and Kroger's Construction Engineer Patterson. I fail to see in what manner Kroger could settle the dispute with Respondent except to now agree that in the future it would subcontract only to union contractors or deal only with firms employing union contractors. Such activity is clearly proscribed by Section 8(b)(4)(A) of the Act. The Columbus Building and Construction Trades Council, AFL-CIO (Merchandise Properties, Inc.), 149 NLRB 1224, Columbus Building and Construction Trades Council, AFL-CIO (The Kroger Co.), 164 NLRB 516.

On the basis of the foregoing, I would find that by its picketing and handbilling Respondent violated Sections 8(b)(4)(i), (ii)(A) and (B) of the Act as alleged in the complaint.

It might be thought that inasmuch as the picketing and handbilling ceased sometime in August, 1971, our consideration of the matter is academic. However, the Board's brief to us says:

"On October 29, 1971, the United States District Court for the Eastern District of Arkansas enjoined both the picketing and the handbilling under Section 10(*l*) of the Act pending resolution of the case by the Board. See Reynolds v. Plumbers, Local 155, 79 LRRM 2224 (E.D.Ark., 1971)."

Therefore, if the Board's approval of the handbilling is approved, such handbilling might indeed be resumed.

We remand this case to the Board for entry of orders consistent with our opinion.