422 F.Supp. 1379 (1976)
Richard A. and Joanne ANDERSON d/b/a Fireside Lounge, Plaintiffs,
v.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL NO. 712, AFL-CIO, Defendant.
Civ. A. No. 75-261.
United States District Court, W. D. Pennsylvania.
December 3, 1976.
*1380 *1381 Robert A. King, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for plaintiffs.
J. Lauson Cashdollar, Luce, Good & Tosh, Beaver, Pa., for defendant.

OPINION
COHILL, District Judge.

Background
Plaintiffs, Richard A. Anderson and his wife, Joanne, are the proprietors of the Fireside Lounge, a restaurant/bar in the Hopewell Shopping Center, Beaver County, Pennsylvania. They brought this action against the defendant, International Brotherhood of Electrical Workers, Local No. 712, AFL-CIO (The "Union") pursuant to § 303 of the National Labor Relations Act of 1947, as amended (29 U.S.C. § 187). They are seeking general damages, punitive damages and attorney's fees for alleged unfair labor practices.
Few of the facts are in dispute; most were stipulated to by counsel, and we heard the case non-jury.

I

The Facts
Pursuant to Rule 52(a), Fed.R.Civ.P., we find that the facts of the case are these:
The Fireside Lounge occupies premises leased by the plaintiffs from one Philip Reicher, trading as Hopewell Shopping Center. The operator/manager of the shopping center is West Penn Realty Company ("West Penn"), and it was with West Penn that plaintiffs always dealt concerning their lease, just as if West Penn were the actual owner.
On October 17, 1974, there was a fire at the Fireside Lounge, partially destroying the premises. Under the terms of the lease the landlord was required to restore the premises in the event of fire, and West Penn proceeded to enter into a general contract with Marrone Construction Company, Inc. (Marrone) for the repairs.
On October 28, 1974, the defendant Union's business agent, Edwin D. Hill, wrote the following letter to Fireside Lounge on defendant's letterhead:
 October 28, 1974
 Fireside Lounge
 23A Hopewell Shopping Center
 Aliquippa, Pa.
Dear Sir:
It has come to our attention that you may be doing some remodeling due to the recent fire in your business establishment. Local Union 712 is very interested in who will be performing the electrical work connected with your remodeling.
For your information and consideration, we are enclosing a list of contractors affiliated *1382 with Local Union 712 located in Beaver County. They are all fine businessmen who employ skilled craftsmen. I am sure any one of them would be very happy to give you a price.
If we can be of any further service, please feel free to call.
 Very truly yours,
 (Signed) Edwin D. Hill
 Business Manager
EDH/mvb
Enclosures (2)
On or about November 4, 1974, Marrone subcontracted the electrical work to Marchilena Electric Service (Marchilena), a nonunion contractor. On November 14, 1974, the Union started picketing the Fireside Lounge premises, and this continued for a period of approximately three weeks until December 3, 1974, which was when substantially all of the electrical work being done by Marchilena was finished. During this period of time the pickets had carried signs which read:

TO WHOM IT MAY CONCERN ELECTRICAL WORK BEING PERFORMED ON THIS PROJECT IS BEING DONE BY NON UNION ELECTRICAL WORKERS
Sometime around the end of 1974 or beginning of 1975 a "blacklist" was posted in the Union hall with the names of some thirty-four companies and individuals on it. At the top of the page, in capital letters, it said "Unfair to Local Union 712 Please Do not Patronize." The list included the name "Fireside Lounge, Hopewell Shopping Center." The Fireside Lounge remained on the blacklist from around the beginning of 1975 until August 29, 1975.
The Lounge reopened for business on January 14, 1975. From January 24, 1975 until on or about February 5, 1975, pickets outside the Fireside Lounge carried signs which said:

ATTENTION AFL - CIO MEMBERS PLEASE DO NOT PATRONIZE FIRESIDE LOUNGE ELECTRICAL WORK DONE NON UNION
They also distributed printed handbills which stated:

ATTENTION AFL - CIO UNION MEMBERS ARE YOU AWARE THAT THE MONEY YOU SPEND AT FIRESIDE LOUNGE IS BEING USED TO SUPPORT NON UNION LABOR

One of the questions to be determined here is, when did the Union find out that the plaintiffs had nothing to do with contracting for the work? We do not find sufficient evidence on the record to hold that the Union realized it during the first period of picketing, that is from November 14 to December 3, 1974.
Plaintiff, Mr. Anderson, testified that he notified West Penn that he had received the October 28 letter from the Union, but that he made no effort himself to respond to the letter or contact the Union in November or December. In November, he did tell West Penn that the Lounge was being picketed and that West Penn should "get straightened away with 712."
The business agent, Mr. Hill, testified that up until January 24, 1975, he thought that it was the Lounge which had entered into the non-union repair contracts. This was the day that the picketing resumed and the handbilling started; West Penn, at the request of the Andersons, apparently called the police to order the pickets away. Meanwhile, Mrs. Anderson called Mr. Hill and informed him that West Penn, not the Fireside, had contracted for the work. Mr. Hill then went to the premises and engaged in discussions with the plaintiffs.
*1383 The conversation was heated, to say the least, with Mr. Anderson telling Mr. Hill that he had nothing to do with the reconstruction contract and threatening to ask the police to remove Mr. Hill forcibly, and Mr. Hill telling Mr. Anderson that he (Mr. Anderson) should have "packed up and moved out." (Mr. Hill denied making that statement). The pickets left January 24, but despite the protestations of Mr. and Mrs. Anderson that they had nothing to do with the hiring of a non-union electrical contractor, the pickets returned the next day and remained for almost two weeks until February 5, some six days after Mr. and Mrs. Anderson brought unfair labor charges against the Union before the National Labor Relations Board.
When the pickets were withdrawn by the Union, the unfair labor charges were dropped by the Andersons.
We find as a matter of fact that the Union, through its agent, learned that the plaintiffs were not involved in contracting for the repairs of the premises on January 24, 1975. As noted, there is insufficient evidence to support a finding that the Union had this knowledge during the first period of picketing. The picket signs during that period simply stated that the electrical work was being done by non-union electrical workers; this was true. In addition, the Lounge was not open for business during this period.
The picketing and distribution of handbills during the second period, January 24 to February 5, 1975, however, represented something quite different. The picket signs advised the passersby not to patronize the Fireside Lounge because the electrical work had been done non-union. Although factually true, this picket sign was misleading; it implied that the Fireside Lounge had arranged for the non-union work.
The handbill was worse; it was completely false in that it stated: "The money you spend at Fireside Lounge is being used to support non-union labor."
The situation was aggravated in that the Union's business agent, Mr. Hill, was apprised of the true facts on the first day of this second period, January 24, yet he persisted in permitting this picket sign to be displayed and the false handbills to be distributed for another eleven days.
As a result of being on the blacklist and the picketing and handbilling activities during the period, January 24 to February 5, plaintiffs suffered financial damage.

II

The Law
In accordance with Fed.R.Civ.P. Rule 52(a) we make the following conclusions of law based on the above findings of fact:
The relevant definitions of unfair labor practices are found in 29 U.S.C. § 158(b)(4)(ii)(B):
"4(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an objective thereof is 
* * * * * *
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person ..."
The Union's picketing and handbilling were clearly directed at potential customers as a "suggestion" that they boycott the Lounge. This was a serious and ominous union objective in the situation under consideration here. Kroger Company v. N. L. R. B., 477 F.2d 1104 (6th Cir. 1973). The picket signs themselves were misleading since they did not carry the name of West Penn, the real employer of the non-union contractor, and could be construed as indicating a dispute between the Union and plaintiffs. Sperry v. Building and Construction Trades Council, 131 F.Supp. 36 (W.D.Mo.1955). The handbills were totally false and as such were not a protected activity.
This objective of boycotting was illegal under the circumstances of this case.
*1384 Another objective of the Union appeared to be to force plaintiffs to cease being tenants of West Penn. It is unlawful for a labor organization to, among other things, bring pressure to bear on a neutral employer to cease doing business with another with whom the union has a dispute. Sheet Metal Wkrs. Int. Ass'n., Local 223 v. Atlas Sheet Metal Co., 384 F.2d 101 (5th Cir. 1967). This prohibition against secondary boycotts seeks to reconcile the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." N. L. R. B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284, 1497 (1951).
Plaintiffs had no say as to whether or not West Penn hired a union contractor. The dispute should have been between the Union and the employer responsible for hiring non-union workers, West Penn. The Union's picketing was not protected since an object of the activity was to coerce the secondary employer, the plaintiffs, to cease doing business with the primary employer, West Penn. N.L.R.B. v. Millmen and Cabinet Makers Union, Local 550, 367 F.2d 953 (9th Cir. 1966). Coercion within the concept of 29 U.S.C. § 158(b)(4) can be found even though the picketing results in no general boycott. N.L.R.B. v. Twin City Carpenters District Council, 422 F.2d 309 (8th Cir. 1970). The fact that the Lounge was not forced to close has nothing to do with the illegal objective of the Union.
Any doubt as to whether or not the Union carried on a secondary boycott is removed upon examination of the Union's conduct after January 24. The Union abused its power and acted irresponsibly by refusing even to consider plaintiffs' statements that they had not employed a nonunion contractor and by failing to use diligence in ascertaining the real employer. While we do not hold that the Union is an insurer in such a situation, we do find that the Union had an affirmative duty to attempt to ascertain the truth or falsity of plaintiffs' statements before continuing with picketing which was potentially illegal.
The picketing and handbilling were unfair labor practices in violation of 28 U.S.C. § 158(b)(4)(ii)(B) as they were designed to force plaintiffs "to cease doing business with any other person."

III

Damages
The Union is liable for damages suffered by plaintiffs as a result of the Union's illegal conduct. The measure of damages in a section 303 suit (29 U.S.C. § 187) was clearly articulated in Sheet Metal Workers Association, Local No. 223 v. Atlas Sheet Metal Co., supra, 384 F.2d at 109:
"Section 303 of the NLRA, 29 U.S.C. § 187 permits any person injured in his business or property as a result of a section 8(b)(4) violation to bring suit to recover the damages he has sustained plus the costs of the suit. The statute is compensatory in nature * * * and damages may only be recovered for actual losses sustained as a result of the unlawful secondary activity. While the employer must prove that he has sustained some injury to his business or property, he need not detail the exact amount of damages suffered. It is sufficient if the evidence supports a just and reasonable approximation. (Citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 [1931])
Damages in a case such as this cannot be ascertained with precision. To do justice, it is necessary to distinguish between proof of the fact of damages and proof of the amount of damages. Eazor Express, Inc. v. International Brotherhood of Teamsters, 376 F.Supp. 841 (W.D.Pa.1974).
Plaintiffs have succeeded in proving that they were in fact damaged as a result of the Union's conduct. Plaintiffs offered testimony of their accountant who *1385 compared their gross profits during the prepicketing period from January 16, 1975 to January 23, 1975 with their gross profits during the part of the picketing period between January 24, 1975 and January 31, 1975. Using this comparison, and by taking into account variables and costs involved in this type of business, the accountant stated that plaintiffs lost about $286 during the picketing from January 24, 1975 to February 5, 1975. Plaintiffs' accountant then computed their continuing lost profits by taking their lost gross sales and by multiplying that figure by the appropriate markup (food  40%, liquor  60%). Plaintiffs testified that they now have an average of ten fewer customers per week patronizing the restaurant and will probably continue to do so because of the Union's conduct. The accountant's computations based on the time after the picketing ceased resulted in a figure of $114 per week in lost profits caused by the loss of an average of ten customers per week.
The fact of damages has been established; unfortunately, the exact amount of damages is impossible to determine with mathematical certainty.
There are two time periods which should be considered in determining damages: (1) the second picketing period, January 24, 1975 (when the Union learned that plaintiffs had not hired the non-union labor) until February 5, 1975 (when the pickets were removed); plus either (2) the period February 5, 1975 (when the pickets were removed) until August 29, 1975 (when the Fireside Lounge was removed from the blacklist), or (3) from February 5, 1975 (when the pickets were removed) until some indeterminate time in the future when the plaintiffs decide to leave the restaurant business.
The third alternative is entirely too vague and indefinite to be considered.
While plaintiffs endeavored to prove that they will continue to lose $114 per week ad infinitum, we find this approximation of damages to be beyond the "just and reasonable approximation" dictated by the Supreme Court and in the realm of speculation. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 74 L.Ed. 544 (1931) as cited in Sheet Metal Workers Association, Local No. 223 v. Atlas Sheet Metal Co., 384 F.2d 101 (5th Cir. 1967). Too many variables and unknowns exist to permit the establishment of damages for this period.
We are satisfied, however, that plaintiffs lost $286 during the picketing from January 24 until February 5. We are also satisfied that the loss of ten customers per week thereafter cost the plaintiffs about $114 per week in lost profits for at least the period of time that the Fireside Lounge was blacklisted from February 5 until August 29.
The effect of blacklisting cannot be underestimated in a union-oriented area such as Beaver County. It is a well-known union weapon, and its effect can be far reaching in a case such as this where many patrons of the business are union members. Applying plaintiffs' continuing lost profit figure of $114 per week to the February 5  August 29 period, and considering that period to be 29 weeks, we find $3,306 as a just and reasonable estimation of plaintiffs' damages during that period.
Therefore, we find that during damage period 1, the amount of damages is $286 and during damage period 2 is $3,306, or a total of $3,592.00.
Plaintiffs are also seeking punitive damages. Pennsylvania has adopted the rule of punitive damages as set forth in § 908 of the Restatement of Torts. Chambers v. Montgomery, 411 Pa. 339, 192 A.2d 355 (1963). However, since state law is displaced by § 303 of the National Labor Relations Act in punitive damage actions based on a union's secondary activities, and since only compensatory damages can be awarded for a § 303 violation, a federal court has no power to award punitive damages on the basis of state law. Local 20, Teamsters, Chauffeurs and Helpers Union v. Lester Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).
Plaintiffs also seek attorneys' fees resulting from their efforts to terminate *1386 the illegal conduct of the union. Damages in a section 303 suit may include costs of reasonable legal action taken to effect a resumption of work. Refrigeration Contractors, Inc. v. Local No. 211, Plumbers and Pipefitters, AFL-CIO, 501 F.2d 668 (5th Cir. 1974). However, in this case the Fireside Lounge never closed during the Union's picketing. Without the prerequisite work stoppage, attorneys' fees cannot be awarded in a section 303 suit. Therefore, we deny plaintiff's request for such fees.
An appropriate order will be entered.