**NORANDA ALUMINUM, INC.,**
**Appellee and Cross-Appellant,**

v.

**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, and United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Local 618, Appellants and Cross-Appellees.**

**Nos. 74–1467, 74–1562.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 10, 1975.

Decided Jan. 5, 1976.

Rehearing Denied Feb. 17, 1976.

Bernard Dunau, Washington, D. C., for United Brotherhood of Carpenters, and others.

Gerald Tockman, St. Louis, Mo., for Noranda Aluminum.

Before GIBSON, Chief Judge, CLARK,* Associate Justice, and LAY, Circuit Judge.

Mr. Justice CLARK.

Appellants and cross-appellees, United Brotherhood of Carpenters and Joiners of America, AFL–CIO (Carpenters' International) and Local 618 of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (Local 618) appeal from a judgment in the amount of $914,-823.34 recovered against them by appellee and cross-appellant, Noranda Aluminum, Inc. (Noranda), a Delaware corporation. The recovery was based on a jurisdictional strike called and maintained by the Unions at the construction site of a primary aluminum smelter being built by Noranda in New Madrid, Missouri, in 1970. Jurisdiction was laid under § 303(b) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 187, and § 8(b)(4) thereof, 29 U.S.C. § 158(b)(4). The District Court found the strike to be illegal under § 158(b)(4)(D) for which compensatory damages were recoverable under § 303(b) but denied prejudgment interest, reasonable attorneys' fees incurred in the prosecution of the suit, and damages for the loss of cash flow. We affirm the judgment.

## I.

The smelter was being constructed for Noranda under a contract with Kaiser Engineers, Inc. (Kaiser), during the period between March, 1969, and February, 1972, on a cost-plus-fixed-fee basis. Kaiser had collective bargaining agreements on a national basis with the international unions operating in the building trades. Its contract with Carpenters' International provided, among other things, that Kaiser would work the hours, pay the wages, and observe the working conditions established or agreed upon by Carpenters' International and the recognized bargaining agent in the locality where the work was performed. The Carpenters' International further agreed with Kaiser that "there will be no stoppage of work or any strike of its members either collectively or individually until said dispute or misunderstanding has been referred to the International Office of the Union and arbitrated between such International Office of the Union and the Home Office Representative of the employer." Preparatory to beginning construction, pre-job conferences and "mark up" meetings were held to determine the jurisdiction of the various unions involved in the project. Subsequently, Kaiser issued a "Summary of Jurisdictional Agreements, Joint Board Decisions, and Work Assignments," which included a section on work assignments that were still in dispute. With reference to the latter, Kaiser assigned the work "in accordance with the National Joint Board procedure" by utilizing local and other practices in the trade. Under this section the pipefitters were assigned "air lift systems," "recovery systems," and "air operated gates and valves," while the millwrights were assigned "dry material chutes" and "rack and pinion gates." However, the cover letter transmitting this Summary provided that the assignments were subject to change by agreement between the disputing trades.

The record indicates that a number of jurisdictional disputes arose, of which some were settled by international representatives, others by business agents and stewards. A list of disputes between the millwrights and the pipefitters was prepared by Kaiser in October, 1969, and included such work assignments as "anode paste equipment," "dry material chutes," and "rack and pinion gates." The pipefitters' claim to jurisdiction over the latter two areas arose through an interpretation by the pipefitters of the word "systems" used in the Kaiser assignment. The pipefitters claimed that "chutes and gates" were included within "systems" and insisted that such work be assigned to them. Kaiser subsequently made such a transfer on the understanding that the respective stewards of the disputing unions had agreed upon a

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

division of the work in dispute along the line of the "St. Louis Agreement." This agreement provided that millwrights or pipefitters or both install equipment depending on the "system" in which the item functioned, its relation to other equipment, and similar factors. In late June, a jurisdictional dispute arose at the smelter site despite Kaiser's claim to have reached the understanding with the stewards. Both Local 618 and Carpenters' International deny that they agreed to be bound by the "St. Louis" rules, and all parties conclude that this is the crux of the controversy.

In an effort to settle the dispute, a meeting was held on July 8, 1970, among representatives of the Internationals and the business agents and stewards of the two locals. No agreement was reached, however, and the controversy was referred to the "Presidents' Committee." The "Presidents' Committee" was established to resolve this type of controversy. However, no action was taken either by the Presidents' Committee or the Joint Board toward the settlement of the controversy. Kaiser, on the contrary, received a telegram from the Joint Board, directing it to proceed immediately with its initial work assignment since there was no agreement between the trades involved. Kaiser advised the Board that "any changes [it made] were made at the job steward level at the job site." Kaiser insisted that the dispute be submitted to the Joint Board for decision on the merits, but appellants refused. Likewise, the contractor's suggestions that the parties arbitrate as provided in the contract between Kaiser and Carpenters' International fell on deaf ears. As the District Court specifically found, the record shows that the Business Agent of Carpenters Local 618 had his "instructions" from Carpenters' International. See Findings 11 and 12.

On July 29, one day before the strike began, Kaiser agreed to temporarily halt work on the disputed items if the Business Agent of the Carpenters' Local 618 would meet with the Business Agent of the Pipefitters the next day. Kaiser issued the order and the pipefitters halted work on the 29th but the millwrights did not. The proposed meeting between the Business Agents was never held because the pipefitters' Business Agent was in an earlier scheduled business meeting, and the millwrights refused to wait until that meeting was over. They would not reschedule the proposed meeting. The pickets came on the next day, July 30, and continued through August 13, 1970. The object of the strike "was to force Kaiser to put millwrights on the rack and pinion gates and chutes and to remove the pipefitters therefrom." Both Kaiser and the Joint Board requested the President of the Carpenters' International to instruct Carpenters' Local 618 to remove the picket line but the request was ignored.

II.

▆ Appellant-Unions' first claim is that the strike was not a jurisdictional dispute but on the contrary was caused by Kaiser's "failure to honor his own contractual assignment of work to which he has committed himself." Cf. *Highway Truckdrivers, Local 107*, 134 N.L. R.B. 1320 (1961). Appellant-Unions say that Kaiser's August 1969 "Summary" obligated it to assign dry material chutes and pinion gates to the millwrights. However, the 14-day work stoppage here was the direct result of the conflicting jurisdictional claims of the pipefitters and the millwrights over that work. The situation fits like a glove the prohibition of § 8(b)(4)(D), regardless of whom the "Summary" favored. The nature of the conflict was the same and the opposing claims resulting in the strike were just as intolerable. Hence the resulting strike is illegal simply because "both groups persist in laying claim to the disputed work." *Laborers Local 116 (E & S Masonry, Inc.)*, 187 N.L.R.B. 482, 76 LRRM 1052, 1053 (1970). As Mr. Justice Black so well said as to a similar situation in *N.L.R.B. v. Radio & Television Broadcast Engineers*

*Union*, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961):

> It is true, of course, that employers normally select and assign their own individual employees according to their best judgment. But here, as in most situations where jurisdictional strikes occur, the employer has contracted with two unions, both of which represent employees capable of doing the particular task involved. The result is that the employer is placed in a situation where he finds it impossible to secure the benefits of security from either of the contracts, not because he refuses to satisfy the unions but because the situation is such that he cannot satisfy them. . . . We therefore are not impressed by the Board's solicitude for the employer's right to do that which he has not been, and most likely will not be, able to do. At 582–583, 81 S.Ct. at 336.

Here, in addition, the contract was ambiguous on the point which makes it the more imperative that the purpose of § 8(b)(4)(D) not be frustrated. *International Brotherhood of Carpenters v. C. J. Montag & Sons*, 335 F.2d 216, 220 (9th Cir. 1964), *cert. denied*, 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701. However, we need not decide the matter on such a basis for here the trial judge found against appellant unions deciding that a local agreement between the stewards of the competing unions had superseded the Kaiser agreement under the "Summary." We cannot say on the record here that this finding is clearly erroneous.

■ The Carpenters' International also argues that it cannot be held liable for the action of Local 618. But the underlying facts were decided against the Carpenters' International. The trial judge found that the strike was the result of the joint effort of the Carpenters' International and Local 618. The record also shows that the Carpenters' International, although kept fully informed of the situation, did nothing to prevent the strike. On the contrary, during its progress, the International continually ignored the pleas of Kaiser and the Joint Board to call it off.

We have made a careful examination of the record and find that substantial evidence supports the findings, and we cannot conclude that they are clearly erroneous. See, Findings 4, 5, 6 and 7; *N.L.R.B. v. International Longshoremen's and Warehousemen's Union, Local 10*, 283 F.2d 558, 565–66 (9th Cir. 1960); *International Brotherhood of Carpenters v. C. J. Montag and Sons*, 335 F.2d 216, 221 (9th Cir. 1964), *cert. denied*, 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965); *Truck Drivers Local Union 728 v. N.L.R.B.*, 332 F.2d 693, 697 (5th Cir. 1964); *International Brotherhood of Electrical Workers v. N.L.R.B.*, 181 F.2d 34, 38 (2d Cir. 1950), *aff'd*, 341 U.S. 694, 704, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).

## III.

Finally, appellant-Unions attack the award of damages as being totally unconnected to the strike and not calculated with reason and fairness. They downgrade the Kaiser estimates. Those estimates were prepared at the insistence of Noranda and base recovery on a comparative study between the time the project should have been completed without the strike and the actual time it took with the strike [C.P.M.]. They criticize the inclusion of certain elements in these computations, such as the time to attain "first metal" (January 23, 1971), the estimates of labor efficiency, and the failure of Kaiser to give any weight whatsoever to other significant events claimed to bear directly on the delay encountered.

We have carefully considered each of these claims. Noranda's final construction cost was $22 million over its original estimate of $85 million. It employed a task force of Kaiser professional personnel to determine the damages suffered because of the carpenters' strike. The experts came up with a number of damage items, summarized in Noranda's Exhibit 80, which include: cost directed at stopping the strike and picketing; rail-

way demurrage, truck detention, warehousing costs, and rehandling expenses; construction and office equipment losses; salaries and utility overhead paid to cost-plus-fixed-fee contractors; start-up losses; and, the largest item, $693,090.10, covering premium payments of working manhours lost during, or as a result of, the strike. The court denied recovery of prejudgment interest, attorneys' fees, and loss of cash flow. A judgment was entered for $914,823.54 covering the other items above listed.

The appellant-Unions acquiesce in some of the allowances of the trial judge, including: (a) salary and expense amounts and attorneys' fees directed at stopping the strike; (b) railway car demurrage, truck detention, warehousing costs, etc., except for $9055 [1]; (c) rental and depreciation costs of construction and office equipment, except two items (office equipment overhead loss, $5345.33, and builders risk insurance premium, $2719.53 [2]); (d) salaries and utilities overhead paid to cost-plus-fixed-fee contractors; and (e) 35.5 per cent [3] of construction and raw material costs incurred to minimize start-up delay and utility overhead payments for a trained production staff that was forced to remain idle for 33 days.

The Unions dispute item (c) of the trial judge's findings on damages which includes increased overtime premium payments to work manhours lost by the craft construction employees of Kaiser Engineers, Comstock-Roper, and fixed-price subcontractors. Appellant-Unions break it down into two parts: $626,361 ascribed to work performed for Kaiser and Comstock-Roper, the electrical subcontractor, and overtime in the sum of $66,729.10 ascribed to work performed for fixed-price contractors. In essence the appellant-Unions say that this extra cost is attributable to the inefficiency of labor and a three-day strike of laborers which shut down work on July 23, 24, and 27, 1970. They, therefore, acquiesce in only 35.5 per cent of this item on the same ground as in item (f).

Section 303(b) provides for the recovery of "damages sustained and costs of suit" in cases involving illegal jurisdictional strikes. This includes all actual compensatory damages. *Teamsters Local 20 v. Morton*, 377 U.S. 252, 260, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). Experience in this field clearly shows that damages resulting from illegal jurisdictional strikes cannot be proven with exacting detail and the proof is therefore quite sufficient where the evidence supports a just and reasonable approximation. *Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Co.*, 384 F.2d 101, 109 (5th Cir. 1967). While it is true that the trial court did not spell out in meticulous detail each item of damage, he did clearly find that each item was caused by the illegal strike and that each was a just and reasonable approximation of the actual amount of the damages. The cases on claims of this type require no more. *Vulcan Materials Co. v. United Steel Workers of America*, 430 F.2d 446, 457–58 (5th Cir. 1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971).

The Unions' major criticism centers on Noranda's reliance upon Kaiser's CPM method of computation which predicted January 23, 1971, as first metal date. In fact it was not reached until February 25, 1971. But the Unions overlook entirely the fact that this date was only first metal date on a modified basis of 88 pots, barely 50 per cent of the original

1. Appellant-Unions contest an item of $9055 of these costs resulting from "the unloading of bus materials on the ground at the Noranda site." The evidence as to it is not crystal clear.

2. Appellant-Unions reduce the "office equipment overhead loss" to the period of 15 days during which the strike lasted. Obviously the strike caused a longer period of delay than the 14 days it actually existed, and we cannot say that the 30 days allowed was clearly erroneous. The same is true as to the builders risk insurance premium.

3. Appellant-Unions say that 64.5 per cent of this item is attributable to other causes, *i. e.*, 54.8 per cent to labor inefficiency and 9.7 per cent to a 3-day laborers' strike. The trial judge found to the contrary and on this record we cannot say the finding was clearly erroneous.

projection. In calculating the damages the court accepted this date which only permitted a 33-day delay time when in fact it would have been much longer for the entire 176 pots called for in the specifications. Indeed, "total metal date" was not until mid-June, 1971, almost five months later than originally projected. Perhaps some of this delay was occasioned by inefficient labor and certainly some was occasioned by the 3-day laborers' strike, but the point is that the trial judge chose February 25, 1971, as the cut-off date, when only 88 pots were completed. If he had chosen the mid-June date, when all pots were completed, perhaps the items that the Unions now complain about, as well as some others, would have some weight in the final calculations. We believe, however, that the course pursued was certainly a most reasonable and fair approximation. Indeed, if a later date had been chosen, making allowance for the expedition afforded the 88-pot project, and if the trial judge would have meticulously calculated the percentages as the Unions suggest, we dare say the damages would have totalled a much higher figure. We, therefore, conclude that the overall method of calculating the damages was eminently just and fair to the Unions and that the total amount allowed was a reasonable approximation of the amount suffered by Noranda.

### IV.

■ On Noranda's cross-appeal, we find that the trial judge's conclusion was also correct. The claimed depiction of cash flow or profit is reminiscent of the Rube Goldberg cartoons that graphically transposed speculation into fact by a series of drawings depicting causes and effects. Likewise, to award prejudgment interest would have been to run *contra* to the prevailing rule. Here the damages were unliquidated and could not be ascertained prior to judgment. It is claimed that a majority of the money expended by Noranda was paid out by November 1, 1970. However, the greater part of the damage suffered was in the premium payments made for overtime which occurred between November 9 and February 25, 1971.

 As to the attorney fees, we do not feel that Noranda brings itself within the class of exceptional cases warranting the allowance of fees as a punitive measure or for reasons of justice. While the action of the Unions was not in the best tradition of the trades, we feel that it would be untoward for us to upset the considered judgment of the trial judge who lived through the matter in all of its stages.

The judgment is therefore affirmed.